JUDGE RAKOFF

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ X

JAMES BAKER, Derivatively on Behalf of
JPMORGAN CHASE & CO.,

                    Plaintiff,

       v.

JAMES S. DIMON, JAMES A. BELL,
CRANDALL C. BOWLES, STEPHEN B.
BURKE, DAVID M. COTE, JAMES S.
CROWN, ELLEN V. FUTTER, WILLIAM H.
GRAY, III, LABAN P. JACKSON, JR., DAVID
C. NOVAK, LEE R. RAYMOND, WILLIAM C.
WELDON, DOUGLAS L. BRAUNSTEIN, and
INA DREW,

                    Defendants,

     -and-

JPMORGAN CHASE & CO., a Delaware
corporation,

              Nominal Defendant.

_____ X

Case No. 12 CV 3878

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY,
WASTE OF CORPORATE ASSETS,
AND UNJUST ENRICHMENT



RECEIVED
MAY 1 5 2012
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

By and through his undersigned counsel, Plaintiff James Baker ("Plaintiff") brings this shareholder derivative action on behalf of JP MORGAN CHASE & CO. ("JP Morgan" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and aiding and abetting thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by JP Morgan and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on JP Morgan's website concerning the Company's public statements; and d) review of other publicly available information concerning JP Morgan and the Individual Defendants (defined herein).

## NATURE AND SUMMARY OF THE ACTION

1.    JP Morgan is a global financial services firm with assets of over $2.3 trillion dollars and operations in more than 60 countries. The firm describes itself as "a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity."

2.    On Thursday, May 10, 2012, JP Morgan's CEO James S. Dimon ("Dimon") was forced to admit that the Company had incurred a trading loss over the last month of at least $2 billion from what he described as a "failed hedging strategy." At times during that period the Company had lost as much as $200 million in a single day.

3.    What the Company did not reveal was that those losses were the result of a marked shift in the Company's allowable risk model, undisclosed to investors, and the similarly clandestine conversion of a unit within the Company that was touted as providing a

- 1 -

conservative risk-reduction function into a risky, short-term trading enterprise that exposed the Company to large losses instead.

4. The Individual Defendants were fully aware of both the shift in the Company's risk posture and the fact that large-scale losses were being incurred, but concealed this material information from investors even as the losses were mounting and multiple regulatory authorities initiated investigations into the Company's trading practices.

5. This action arises out of the Individual Defendants' decision to radically alter the Company's investment risk exposure, to conceal this major change in risk exposure from its shareholders, and to further conceal from investors the large-scale losses that the Company was incurring as a result of the increased risk exposure, both by failing to disclose those losses and by issuing materially false and misleading statements concerning the Company's investment risk hedging and trading strategies and exposure to large-scale losses from March 1, 2012 to May 10, 2012 (the "Relevant Period").

6. Throughout the Relevant Period, the Individual Defendants continued to disseminate or failed to correct public statements that misleadingly represented the Company's investment risk exposure. Defendant Dimon went so far as to publically and vigorously dispute that any investment safety regulation was necessary for financial institutions such as JP Morgan, because the Company was purportedly so careful with its investments that no such regulations would be necessary. All of the Individual Defendants knew this was simply not the case.

7. Throughout the Relevant Period the Individual Defendants consistently maintained that the Company had an effective system of investment risk management and risk hedging, implying that shareholders' investment in the Company would be protected as a result.

8.   However, unbeknownst to the public, the Individual Defendants had radically altered the Company's conservative approach to investment hedging, increasing the amount of risk that Company investments would be exposed to and converting the Company department and function that was supposed to monitor, manage, and hedge risk, into a risk-seeking trading department now authorized to chase short-term profits at the expense of long-term investor safety. This radical change in strategy significantly affected the shareholders' exposure to financial risk, in direct contradiction to the Individual Defendants' reassuringly conservative public announcements.

9.   Defendant Dimon even acknowledged that despite his earlier misleading statements, the trading strategy had been an "egregious error" that led to large losses, admitting knowledge of this material, adverse, and undisclosed fact.

10.   As a result of the Individual Defendants' materially false and misleading statements and failure to timely disclose the losses and exposure to losses, JP Morgan's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $46.27 per share on March 28, 2012.

11.   The Individual Defendants' attempts to mislead the market came to a crashing halt when they were forced to admit publicly what they had already known privately. On May 10, 2012, the Individual Defendants caused the Company to issue a press release and held a conference call reporting that the Company had already lost over $2 billion dollars in risky trades, with further losses of the same order of magnitude almost certainly to follow.

12.   When the Individual Defendants revealed the truth about the Company's investment losses, JP Morgan's stock price plummeted $3.68 or over 9% in a single day, from

$40.65 to $36.97, on extraordinarily high trading volume. Approximately $12 billion in market value was wiped out in less than 24 hours.

13.     JP Morgan's Board of Directors ("Board") has not, and will not commence litigation against Defendants, let alone vigorously prosecute such claims, because they themselves face a substantial likelihood of liability to JP Morgan for authorizing or failing to correct the change in trading risk exposure, failing to timely disclose the trading losses, and the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the JP Morgan Board is a useless and futile act. Plaintiff rightfully brings this action to vindicate JP Morgan's rights against its wayward fiduciaries and hold them responsible for the damages they have caused JP Morgan. More specifically, Plaintiff brings this derivative action to: (i) recover damages against JP Morgan's officers and directors for the benefit of the Company, and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect JP Morgan and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

15.     This Court has jurisdiction over each defendant because each defendant is either a corporation that is headquartered in New York, New York, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by the New York courts permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

16.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial

portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to JP Morgan occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

17.     Plaintiff James Baker is a current shareholder of JP Morgan, and has continuously held throughout the Relevant Period. Plaintiff is a citizen of California.

18.     Defendant JP Morgan is a Delaware corporation with principal executive offices located at 270 Park Avenue New York, New York 10017.

19.     JP Morgan is a financial services and investment company. JP Morgan provides various financial services worldwide. Its Investment Bank segment offers various investment banking products and services, including advising on corporate strategy and structure, capital-raising in equity and debt markets, risk management, market-making in cash securities and derivative instruments, prime brokerage, and research services for corporations, financial institutions, governments, and institutional investors. The Company's Commercial Banking segment provides lending, treasury, investment banking, and asset management services to corporations, municipalities, financial institutions, and not-for-profit entities. Its Treasury and Securities Services segment offers cash management, trade, wholesale card, and liquidity products and services to small and mid-sized companies, multinational corporations, financial institutions, and government entities. This segment also holds, values, clears, and services securities, cash, and alternative investments for investors and broker-dealers; and manages depositary receipt programs. The Company's Asset Management segment provides investment and wealth management services to institutions, retail investors, and high-net-worth individuals.

This segment offers investment management in equities, fixed income, real estate, hedge funds, private equity, and liquidity products, as well as trust and estate, banking, and brokerage services to high-net-worth clients; and retirement services for corporations and individuals. Its Retail Financial Services segment offers consumer and business, and mortgage banking products and services that include checking and savings accounts, mortgages, home equity and business loans, and investments. The Company's Card Services and Auto segment provides payment processing and merchant acquiring services.

20. JP Morgan is a publically held company, listed on the New York Stock Exchange. As of January 31, 2012, the number of shares of common stock outstanding was 3,817,360,407.

21. Defendant Dimon is JP Morgan's Chief Executive Officer and Chairman of the Board of Directors. He has been a director since 2005. By the Company's admission, Defendant Dimon is an "inside" director. Defendant Dimon is the sole member of JP Morgan's Stock Committee and is therefore the only Director who can recommend issuance of stock or stock rights options to the Company's Board. Defendant Dimon is a citizen of New York.

22. Defendant James A. Bell ("Bell") is a director of JP Morgan. Defendant Bell is member of JP Morgan's Audit Committee. Defendant Bell is a citizen of Ohio.

23. Defendant Crandall C. Bowles ("Bowles") is a director of JP Morgan. She is the Chairman of Springs Industries, Inc.; that company and its subsidiaries have benefitted from extensions of credit from JP Morgan. Defendant Bowles is a member of the Audit Committee. Defendant Bowles is a citizen of North Carolina.

24. Defendant Stephen B. Burke ("Burke") is a director of JP Morgan. Defendant Burke has been Executive Vice President of Comcast Corporation since January 2011. Comcast

Corporation and its subsidiaries benefitted from extensions of credit provided by JP Morgan. JP Morgan has also made charitable contributions to organizations where Burke served as an officer or trustee. Defendant Burke is a citizen of Pennsylvania.

25.     Defendant David M. Cote ("Cote") is a director of JP Morgan. He is Chairman and Chief Executive Officer of Honeywell International Inc. Defendant Cote has benefitted indirectly from extensions of credit provided by JP Morgan to Honeywell International Inc. and its subsidiaries. Further, JP Morgan purchases building safety and security equipment and maintenance services from Honeywell International Inc. Defendant Cote is a member of the Risk Policy Committee. Defendant Cote is a citizen of New York.

26.     Defendant James S. Crown ("Crown") is a director of JP Morgan. Defendant Crown is president of Henry Crown and Company, a family-owned investment company. Defendant Crown has benefitted from extensions of credit provided by JP Morgan to Henry Crown and Company and other Crown family-owned entities. Further, JP Morgan leases office space and retail space from subsidiaries of companies in which Crown and members of his immediate family have indirect ownership interests. In addition, Crown has benefitted from charitable contributions by JP Morgan to organizations Crown serves as an officer or trustee. Defendant Crown is a member of the Risk Policy Committee. Defendant Crown is a citizen of Illinois.

27.     Defendant Ellen V. Futter ("Futter") is a director of JP Morgan. Defendant Futter has benefitted from extensions of credit provided from JP Morgan directly to her and has benefitted indirectly from extensions of credit by JP Morgan to charitable organizations of which Defendant Futter was an officer or trustee. JP Morgan has also made charitable contributions to organizations where Defendant Futter serves as an officer or trustee.

Defendant Futter is a member of the Risk Policy Committee. Defendant Futter is a citizen of New York.

28.     Defendant William H. Gray, III ("Gray") is a director of JP Morgan. JP Morgan has made charitable contributions to organizations where Defendant Gray serves as an officer or trustee. Defendant Gray is a member of the Audit Committee. Defendant Gray is a citizen of Virginia.

29.     Laban P. Jackson, Jr. ("Jackson") is a director of JP Morgan. Defendant Jackson is the Chairman and Chief Executive Officer of Clear Creek Properties, Inc., a real estate development company. Defendant Jackson has benefitted from extensions of credit provided by JP Morgan directly to him. He is a member of the Audit Committee. Defendant Jackson is a citizen of Michigan.

30.     David C. Novak ("Novak") is a director of JP Morgan. Defendant Novak is the Chairman and Chief Executive Officer of Yum! Brands, Inc. Defendant Novak has benefitted indirectly from extensions of credit provided by JP Morgan to Yum! Brands, Inc. and its subsidiaries. Defendant Novak is on the Corporate Governance Committee and the Compensation & Management Development Committee. Defendant Novak is a citizen of Florida.

31.     Lee R. Raymond ("Raymond") is a director of JP Morgan. Defendant Raymond is on the Corporate Governance Committee and the Compensation & Management Development Committee. Defendant Raymond is a citizen of Arizona.

32.     William C. Weldon ("Weldon") is a director of JP Morgan. Defendant Weldon is Chairman and Chief Executive Officer of Johnson & Johnson Company. Defendant Weldon has benefitted indirectly from extensions of credit provided by JP Morgan to Johnson &

Johnson Company and its subsidiaries. Defendant Weldon is a member of the Corporate Governance Committee and the Compensation & Management Development Committee. Defendant Weldon is a citizen of Pennsylvania.

33. Defendant Douglas L. Braunstein ("Braunstein"), has been the Chief Financial Officer of JP Morgan since June 22, 2010. Defendant Braunstein is a citizen of New York.

34. Defendant Ina Drew ("Drew") was the Chief Investment Officer of JP Morgan during the Relevant Period. Defendant Drew reportedly was directly in the chain of command that directed or released the CIO traders to engage in the herein-described riskier trades. Defendant Drew is a citizen of New Jersey.

35. All Defendants except JP Morgan are sometimes collectively referred to herein as the "Individual Defendants." All Defendants other than JP Morgan and Defendants Braunstein and Drew are sometimes collectively referred to herein as the "Director Defendants."

## SUBSTANTIVE ALLEGATIONS

36. In a conference call on May 10, 2012, the Individual Defendants shocked the financial markets when they announced that JP Morgan's Central Investment Office ("CIO") had lost over $2 billion dollars on risky trades that had been entered into ostensibly as part of a purported risk-reduction "hedging" strategy.

37. Individual Defendants had previously caused JP Morgan to promise its investors strong financial discipline — "a bedrock of great companies" — matched with "superior – not just average – risk management." The Company further promised investors it would "[m]aintain a strong system of internal governance and controls."

38.     Defendant Dimon represented the Company's investment philosophy to investors with this conservative aphorism: "[a]ny company can improve earnings in the short run by taking on additional risk. . . . But it may be the kind of growth one comes to regret."

39.     JP Morgan made proprietary investments in, among other things, different types of debt instruments ("bonds"). Some of these types of bonds are guaranteed against loss by the United States government or its agencies and are therefore considered very safe investments.

40.     At the end of 2010, JP Morgan had 42 percent of its debt portfolio investment in such securities guaranteed by the government. By 2012, unbeknownst to the market, the Company had reduced its investment in these safer bonds to just 30 percent of its portfolio. By comparison, Bank of America had 87 percent of its bond portfolio invested in such high-quality bonds in March 2012.

41.     The Company maintained a unit called the CIO, whose function purportedly was to hedge, or reduce the risk from, Company investments.

42.     In particular, the Company represented to investors that the CIO's trading in what it termed its Synthetic Credit Portfolio was intended to serve as a hedge for other of the Company's investments such as the risky bonds. In fact, however, beginning in 2012 the Company was taking positions in these synthetic credit derivative investments not to hedge its investment exposure but to generate riskier short-term profits, a plan that ultimately backfired.

43.     At the same time that JP Morgan was increasing the risk in its bond portfolio, the Individual Defendants were causing the Company to increase the investment risk exposure of the CIO, the very unit responsible for hedging those risks.

44.     Problems with the CIO's riskier trading strategy and "red flags" about potential large losses began to become apparent to the Individual Defendants toward the end of March

2012. The Individual Defendants, however, gave no indication to investors that anything was wrong, even during a first-quarter earnings call they held on April 13, 2012. Defendant Braunstein assured investors on that call that the Company was "very comfortable with our positions as they are held today." On the same call Defendant Dimon dismissed concerns about the trading risks at the CIO as "a complete tempest in a teapot."

45.     Rather than a "tempest in a teapot," however, the risks were very real, were already incurring significant losses, and were a direct result of changes the Individual Defendants had made and allowed in the Company's trading risk exposure.

46.     JP Morgan uses a modeled figure called Value-at-Risk, or VaR, to limit the types and the size of trades its proprietary traders are allowed to make.

47.     The VaR figure predicts expected portfolio losses over a given time period and at a certain confidence level, given certain assumptions about the investment climate and the behavior of different types of investment. VaR measures have been used in the banking industry since the early 1990's, though they were shown in the financial crisis of 2008 to be "largely useless" in protecting against unexpected events. In late 2008 and early 2009, banks' actual trading losses were found to be far larger than the maximum values predicted by VaR models.

48.     Among the weaknesses identified with using VaR to limit loss exposure is its inability to capture "tail risk," the risk from events that occur infrequently but nevertheless regularly occur.

49.     For that reason, the Basel Committee on Banking Supervision has recommended since 2009 that banks modify or replace their VaR models to better take into account these possible "tail" risk events and reduce their exposure to potential large-scale losses.

50.     Instead, between 2011 and 2012, at the same time JP Morgan was increasing its exposure to risk from its bond portfolio, the Individual Defendants modified the Company's VaR model to increase the amount of risk that the bank's traders would be allowed to take on. The new maximum risk exposure was double or triple the Company's previous allowable limits.

51.     On February 29, 2012, the Company filed its Form 10-K for 2011 with the SEC. In its Form 10-K, JP Morgan disclosed a laundry-list of generic risks facing the Company, including Legal Risks, Business and Operational Risk, Regulatory Risk, Market Risk, Credit Risk, Liquidity Risk, and "Other Risks." None of these mentioned the Company's major change in VaR or CIO's shift from hedging to risky trading that was already in effect in 2012.

52.     The 2011 Form 10-K discussed the Company's "framework for managing risk." According to the Form 10-K, the Value at Risk for the Company's trading and credit portfolio activities was:

| Value at Risk (VaR), in $ millions | 2011 | 2010 |
|---|---|---|
| Total trading VaR | 58 | 71 |
| Credit portfolio VaR | 26 | 33 |
| Total trading and credit portfolio VaR | 76 | 87 |

53.     The February 2012 Form 10-K release never mentioned that the Value at Risk measure the Company used was deliberately changed between 2011 and 2012 in order to increase the amount of risk to which Company traders could expose the Company, and that the true Value at Risk was far greater than that shown. The "disclosure" instead appeared to show a declining risk trend from 2010 to 2011, and did not suggest to investors the truth of the matter: that the Company's Value at Risk measure had been modified to expose the Company to far

greater risk in 2012, imperiling the hedging and risk-reduction functions of the CIO in the name of gambling on increased short-term trading profits.

54.    Consistent with the new VaR and trading mandate, and at the direction of Individual Defendants and Company officers, in 2012 traders in the CIO began to make riskier trades intended not to hedge investments but to generate short-term profits -- if their guesses turned out correct.

55.    In early April, questions surfaced about the CIO after reports emerged that a London-based trader was taking large bets that distorted the market. The size and risk exposure of trades from the CIO under the new VaR and mandate had attracted the attention of regulatory authorities including the SEC and the British financial regulatory authority.

56.    By no later than April 5, Defendant Dimon and all the Individual Defendants had been fully briefed as to the extent and risk exposure of these risky trades.

57.    On April 13, 2012, the Individual Defendants held an earnings conference call to go over First Quarter 2012 results. The Individual Defendants, however, failed to disclose to investors that the Company had radically altered its investment portfolio risk profile and that losses were beginning to mount, and that the situation could potentially become very serious very quickly. Defendant Braunstein assured investors on that call that the Company was "very comfortable with our positions as they are held today." On the same call Defendant Dimon, responding to analysts' concerns about the risky trading positions at the CIO, described any concern about those trading risks as "a complete tempest in a teapot."

58.    The trades in question, however, were anything but a tempest in a teapot, and quickly went from bad to worse. During the week following the April 13 conference call, losses from the trades ballooned to as much as $200 million per day.

59.     The Individual Defendants were all well informed about the mounting losses, and held several meetings over the next several weeks to discuss what to do about them. No investor or other member of the public, however, was informed about these huge losses until May 10, 2012.

## THE TRUTH IS REVEALED

60.     On May 10, 2012 the Individual Defendants initiated another investors' conference call and released to the SEC a Form 10-Q, as they were no longer able to conceal the massive -- over $2 billion to that date -- and continuing trading losses at the CIO.

61.     In the May 10, 2012 Form 10-Q, the Individual Defendants finally disclosed:

> Since March 31, 2012, CIO has had significant mark-to-market losses in its synthetic credit portfolio, and this portfolio has proven to be riskier, more volatile and less effective as an economic hedge than the Firm previously believed.
>
> * * *
>
> The Firm is currently repositioning CIO's synthetic credit portfolio, which it is doing in conjunction with its assessment of the Firm's overall credit exposure. As this repositioning is being effected in a manner designed to maximize economic value, CIO may hold certain of its current synthetic credit positions for the longer term.

62.     Even this disclosure was filled with financial double-speak. By the phrase, "...CIO may hold certain of its current synthetic credit positions for the longer term," the Individual Defendants actually meant that because of the risky and illiquid nature of the trades the CIO had made, certain of the positions might be impossible to unwind in the near term.

63.     Regarding the complex credit derivatives that the CIO had been trading , the Form 10-Q included only a superficial discussion:

> Credit derivatives are financial instruments whose value is derived from the credit risk associated with the debt of a third party issuer (the reference entity) and which allow one party (the protection purchaser) to transfer that risk to

another party (the protection seller) when the reference entity suffers a credit event. If no credit event has occurred, the protection seller makes no payments to the protection purchaser.

As a purchaser of credit protection, the Firm has risk that the counterparty providing the credit protection will default. As a seller of credit protection, the Firm has risk that the underlying entity referenced in the contract will be subject to a credit event. Upon the occurrence of a credit event, which may include, among other events, the bankruptcy or failure to pay by, or certain restructurings of the debt of, the reference entity, neither party has recourse to the reference entity. The protection purchaser has recourse to the protection seller for the difference between the face value of the credit derivative contract and the fair value of the reference obligation at the time of settling the credit derivative contract.

64. Regarding the amount of Credit portfolio activities in the last quarter of 2011 and the first quarter of 2012, the Form 10-Q included the following table, identified as "[u]se of single-name and portfolio credit derivatives":

| (in millions) | Notional amount of protection purchased and sold | | | |
|---|---|---|---|---|
| | Mar 31, 2012 | | Dec 31, 2011 | |
| Credit derivatives used to manage: | | | | |
| Loans and lending-related commitments | $ | 3,325 | $ | 3,488 |
| Derivative receivables | | 26,347 | | 22,883 |
| **Total protection purchased** | | 29,672 | | 26,371 |
| Total protection sold | | 100 | | 131 |
| **Credit derivatives hedges notional, net** | $ | 29,572 | $ | 26,240 |

65. Regarding the Company's net results on credit portfolio hedges, the Form 10-Q included the following table:

**Net gains and losses on credit portfolio hedges**

Three months ended March 31,

| (in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| Hedges of loans and lending-related commitments | $ | (75) | $ | (44) |
| CVA and hedges of CVA | | 176 | | (39) |

| | | | |
|---|---|---:|---:|
| Net gains/(losses) | | $ 101 | $ (83) |

66.     The May 10, 2012 Form 10-Q disclosed for the first time that there had been a significant increase in Value at Risk associated with trading activities in the CIO in the first quarter. The 10-Q stated:

First-quarter 2012 VaR results

\* \* \*

CIO VaR averaged $129 million for the three months ended March 31, 2012, compared with $60 million for the comparable 2011 period. The increase in CIO average VaR was due to changes in the synthetic credit portfolio held by CIO as part of its management of structural and other risks arising from the Firm's on-going business activities.

67.     Even this form disclosure and conference call, however, disclosed neither the extent of the risk to which the new trading approach had exposed the Company, nor the fact that the increase in risk had been intentional and planned, as a vehicle to gamble on short-term trading profits and not, as the 10-Q claimed, for "...management of structural and other risks."

68.     On the May 10, 2012 conference call, Defendant Dimon admitted that "[t]hese were grievous mistakes, they were self-inflicted, we were accountable and we happened to violate our own standards and principles. . . ." Dimon announced that one segment of the Company's guidance would have to be revised from "...approximately plus or minus $200 million . . . . [to an estimated] minus $800 million after-tax" and that an additional $1 billion in losses might be expected.

69.     Defendant Dimon, responding to questions about the strategy, shockingly admitted that the trading strategy leading to the losses was "flawed, complex, poorly reviewed, poorly executed and poorly monitored."

70.     "We know we were sloppy. We know we were stupid. We know there was bad judgment. We don't know if any of that is true yet." Defendant Dimon said. "We took far too

much risk, the strategy that we had was barely vetted, it was badly monitored. It should never have happened."

71.     Defendant Dimon's answers to questions about the trades regarding "who knew and when they knew it" were still evasive, however. An analyst on the conference call asked, "Just curious on when this was caught, if it wasn't caught internally or caught by a regulator …?"

72.     Dimon's response was oblique at best: "You should assume that we try to keep our readers updated about what we know and when we know it and it's just a constant practice of the company. And when I said, it was caught, we started [to] dig into this more and more, most of things were bearing big losses in the second quarter. And of course, when you start to see something like that you act probably – obviously we should have acted sooner."

73.     Defendant Dimon later admitted that he was "dead wrong" to ignore the concerns that analysts and regulators raised over the bank's trading practices in early April.

74.     The Individual Defendants did not disclose, however, that both United States and British regulators had been in discussions with JP Morgan about the suspect trading activity for nearly a month before the Company ever mentioned the risk exposure or losses to investors.

75.     Reputable analysts concluded that "it is reasonable to assume a breakdown in the organizational chain stretches from the CIO to the top floor." (Jason Merriam, founder and citizen of Merriam Investor Services). Other observers stated that what "really hurt" was "the hit to the bank's 'reputational premium.'"

76. U.S. Senator Carl Levin stated that "[t]he enormous loss JP Morgan announced today is just the latest evidence that what banks call 'hedges' are often risky bets that so-called 'too big to fail' banks have no business making."

77. The Company still has not divulged all of the details of the staggering and ongoing loss, but according to CNBC, the trades involved risky bets on a type of derivative investment, specifically on the flattening of a credit derivative curve, described as part of the CDX family of credit indices. Trading on the CDX index involves a "derivative of a derivative," betting on credit risk across a basket of individual credit derivatives.

78. Analysts asked Defendant Dimon why the Company felt they had to add to the Company's exposure to such risky derivative trading. Dimon confessed in the conference call that the Company "did not have to do this at all" – it did not have to expose shareholders to risk of losses of this magnitude.

79. The SEC has opened an investigation into JP Morgan's accounting practices and public disclosures about the trades, according to sources briefed on the matter. The inquiry is understood to concern the bank's past regulatory filings about the internal unit that placed the trades, as well as recent statements from the firm's top executives.

80. A primary focus of the SEC investigation, sources said, is the firm's accounting methods relating to the trades including the implementation of the new VaR model, which authorities believe may have masked the risk surrounding those trades.

81. Defendant Dimon stated that the change in the CIO's VaR had resulted in a near-doubling of the estimated risk, from an average of $67 million for the quarter to $129 million.

82. JP Morgan, after disclosing the loss, took the unprecedented step of restating the first-quarter VaR at the chief investment office. It was at that point that investors learned that

CIO's VaR was relatively stable in 2011, remaining between a minimum of $55 million and a maximum of $64 million, but the VaR at the end of the first quarter 2012 was $186 million using the earlier model - three times larger than it had been less than a year earlier.

83.     Analysts asked Defendant Dimon why the Company had changed its VaR model and made it more risky. Dimon declined to elaborate.

84.     Defendant Dimon taped an interview with NBC's David Gregory for Meet the Press on Wednesday, the day before the conference call on which he revealed the Company's $2 billion in losses. Dimon clearly knew about the losses when he taped the interview but did not mention them.

85.     In a teaser video for the pre-taped segment from Mr. Dimon's interview on Wednesday, Mr. Dimon was shown speaking about the financial crisis of 2008, and how JP Morgan weathered problems that took down other banks. Dimon boasted that JP Morgan was one of the banks that was ". . . a port in the storm," and that "[n]ot all the banks needed to be bailed out."

86.     Neither the Company nor the Individual Defendants have as yet been charged with any civil or criminal violations. According to individuals briefed on the matter, the SEC investigation will be focusing on the firm's accounting methods relating to the trades, how the bank reported risk, and whether changes the Company made to its risk measures were adequately disclosed. (Source: New York Times, May 11, 2012.)

## DUTIES OF THE INDIVIDUAL DEFENDANTS

*Fiduciary Duties*

87.     By reason of their positions as officers, directors, and/or fiduciaries of JP Morgan  and because of their ability to control the business and corporate affairs of JP Morgan, the Individual Defendants owed and owe the Company and its shareholders fiduciary

obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage JP Morgan in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JP Morgan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

88.     Each director and officer of the Company owes to JP Morgan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

89.     In addition to these duties, the members of the Audit Committee owed specific duties to JP Morgan under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings and other press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting. In particular, the Audit Committee's Charter provided as follows:

Duties and responsibilities

The Audit Committee shall have the following duties and responsibilities:

* * *

C. Compliance and regulatory oversight responsibilities

The Audit Committee shall:

- Receive from the General Auditor, periodically, and from management, as appropriate, communications and presentations on significant operating and control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and on the initiation and status of significant special investigations; and initiate such other inquiries into the affairs of the corporation as it deems necessary or appropriate.
- Receive periodic presentations from management and the independent registered public accounting firm on the identification and resolution status of material weaknesses and reportable conditions in the internal control environment, including any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data, and on any fraud, whether or not material, that involves management or other employees who have a significant role in the corporation's internal controls.

* * *

- Review regulatory authorities' significant examination reports pertaining to the corporation, its subsidiaries and associated companies.

D. Financial statement and disclosure matters

The Audit Committee shall:

* * *

- Review and discuss, at least quarterly, with management, the independent registered public accounting firm and the General Auditor the annual audited financial statements and quarterly financial statements, including reviewing the corporation's specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operation."

* * *

- Discuss with management the corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.
- Taking into consideration the Board's allocation of responsibility for review of credit risk, market risk and fiduciary risk to the Board's Risk Policy Committee, discuss with management guidelines and policies for assessing and managing the corporation's exposure to risks, including reputation risk, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

* * *

90.     The Risk Policy Committee Charter describes the following responsibilities incumbent on the Defendants on that Committee:

- The Risk Policy Committee is responsible for oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk, and is also responsible for review of the corporation's fiduciary and asset management activities.

- The corporation's Chief Risk Officer reports to the CEO and is accountable to the Board of Directors, primarily through the Risk Policy Committee.

Authorities and responsibilities

- The Risk Policy Committee is responsible for oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk. In performing this oversight, the Risk Policy Committee shall:

- review with management guidelines and policies to govern the process for assessing and managing such risks.

- review benchmarks for and major financial risk exposures from such risks.

- receive and review reports from management of the steps it has taken to monitor and control such exposures.

- review management's performance against these policies and benchmarks.

- receive and review reports on selected risk topics as management or the Committee deems appropriate from time to time.

- meet not less than semi-annually with the Audit Committee on topics of common interest.

- meet, through one or more members, not less than annually with the Compensation & Management Development Committee of the Board of Directors to assist that committee in its review of the corporation's compensation practices and the relationship among risk, risk management and compensation in light of the corporation's objectives, including its safety and soundness and the avoidance of practices that would encourage excessive risk.

- approve and periodically review the corporation's Risk Appetite Policy, and review actual or forecast results exceeding risk appetite tolerances.

- approve and annually review the corporation's policies (the "Global Primary Risk Policies") with respect to Risk Management Governance, Capital Management, Liquidity Risk Management, Wholesale Credit Risk Management, Consumer Risk Management (Retail Financial Services and Card Services), Market Risk Management, Principal Risk, Operational Risk Management, and Reputational and Fiduciary Risk Management.

\* \* \*

### Control, Access, and Authority

91.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of JP Morgan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by JP Morgan.

92.     Because of their advisory, executive, managerial, and directorial positions with JP Morgan, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of JP Morgan.

93.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of JP Morgan, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

94.     To discharge their duties, the officers and directors of JP Morgan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of JP Morgan were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid

wasting the Company's assets, and to maximize the value of the Company's stock;

       (c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

       (d)    remain informed as to how JP Morgan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

       (e)    ensure that JP Morgan was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

95.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to JP Morgan and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of JP Morgan, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of JP Morgan, the absence of good faith on their part, and a reckless disregard for their duties to JP Morgan and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to JP Morgan.

96.    Defendant Dimon breached his fiduciary duties to investors by implementing and/or approving greater investment risks, by concealing and failing to timely disclose the risks and mounting losses, and by issuing false and misleading public announcements regarding both the risks and the losses.

97.    The Individual Defendants, excluding Dimon, breached their fiduciary duties by approving the higher risk measures and by failing to timely disclose to investors both the higher risks and the mounting losses.

98.   The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that JP Morgan had not taken on additional trading risk, and by failing to correct these statements after they were made.

99.   In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now or almost certainly will soon be the subject of a class action lawsuit that alleges violations of federal securities laws.  As a result, JP Morgan has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

100.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

101.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that JP Morgan was successfully diversifying into new businesses while increasing revenues and market share in its traditional switching and router businesses and that its new organizational structure was operating successfully.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

102.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

103.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

negligently adopt inappropriately risky trading strategies in the guise of investment hedging, and further to release improper statements regarding those strategies. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

104.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO JP MORGAN

105.    As a result of the Individual Defendants' wrongful conduct, JP Morgan adopted inappropriately risky trading strategies that resulted in at least an immediate $2 billion dollar loss, and likely greater. Individual Defendants' further caused JP Morgan to disseminate false and misleading statements and to conceal the losses from investors, which resulted in increased damages to JP Morgan. The losses and improper statements have devastated JP Morgan's credibility. Additionally, JP Morgan is likely to be the subject of a securities fraud class action lawsuit, if not already. The Company will face substantial costs in connection with an investigation and the lawsuit.

106.    As a direct and proximate result of the Individual Defendants' actions as alleged above, JP Morgan's market capitalization has been substantially damaged.

107.    Further, as a direct and proximate result of the Individual Defendants' conduct, JP Morgan has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)        costs incurred in investigating and defending JP Morgan and certain officers in a SEC regulatory investigation, an almost certain class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy adverse criminal and/or civil judgments;

(b)        costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on JP Morgan's artificially-inflated stock price and inflated revenues; and

(c)        costs incurred from the loss of the Company's customers' confidence in JP Morgan's services.

108.    Moreover, these actions have irreparably damaged JP Morgan's corporate image and goodwill. For at least the foreseeable future, JP Morgan will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that JP Morgan's ability to raise equity capital or debt on favorable terms in the future is already impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively in the right and for the benefit of JP Morgan to redress injuries suffered, and to be suffered, by JP Morgan as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. JP Morgan is named as a nominal defendant solely in a derivative capacity.

110.    Plaintiff will adequately and fairly represent the interests of JP Morgan in enforcing and prosecuting its rights.

111.    Plaintiff was a shareholder of JP Morgan at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

112.   Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

113.   The Board of JP Morgan currently consists of the following twelve Defendants: Bell, Bowles, Burke, Cote, Crown, Dimon, Futter, Gray, Jackson, Novak, Raymond, and Weldon.

### Demand is Futile as to Defendant Dimon

114.   Defendant Dimon faces a substantial likelihood of liability for his individual misconduct. Further, if not already, he is expected to be a named defendant in a federal class action in the Southern District of New York alleging that he and the Company violated §10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved false statements.

115.   If Defendant Dimon pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws. This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Dimon's personal liability in the class action. As such, Defendant Dimon is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to Defendant Dimon.

116.   Additionally, Defendant Dimon cannot render an independent decision because he is and was a high-ranking officer of JP Morgan during the time period when the wrongdoing occurred. Defendant Dimon serves as the CEO and a director of JP Morgan's Board, did so throughout the Relevant Period, and oversaw the Company's radical shift in investment risk policy. According to relevant portions of the Company's 2011 proxy statement, Defendant Dimon is not an independent director. Defendant Dimon is a current Company insider and therefore cannot independently consider a demand.

117.    Additionally, Defendant Dimon is interested because he issued many of the false and misleading statements.    Defendant Dimon therefore faces a substantial likelihood of liability for breaching his fiduciary duties to JP Morgan shareholders. Consequently, Defendant Dimon cannot disinterestedly consider a demand.

### *Demand is Futile as to Defendant Bell*

118.    Defendant Bell faces a substantial likelihood of liability for his individual conduct. Defendant Bell was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and complete. Defendant Bell was also a member of the Audit Committee and thus bears an even higher standard of duty due to the responsibilities specifically delegated to those committee members by the Company's Board. Bell took part in discussions about the risky trades and the attendant large losses and therefore was fully informed about this material information but did not inform the investors. This authorization of statements and/or failure to correct them and failure to disclose material information constitutes a breach of fiduciary duty, for which Defendant Bell faces a substantial likelihood of liability. As an Audit Committee member, Defendant Bell was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he failed and/or refused to do so during the Relevant Period when Defendant Dimon and others made false and misleading statements and failed to disclose material risks that caused the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile.

### *Demand is Futile as to Defendant Bowles*

119. Defendant Bowles faces a substantial likelihood of liability for her individual misconduct. Defendant Bowles is a director of JP Morgan and a member of the Audit Committee, and thus bears an even higher standard of duty due to the responsibilities specifically delegated to those committee members by the Company's Board. As an Audit Committee member, Defendant Bowles was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, she failed and/or refused to do so during the Relevant Period when Defendant Dimon and others made false and misleading statements and failed to disclose material risks that caused the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile.

120. As a Director, Defendant Bowles had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, she reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Bowles faces a substantial likelihood of liability. For this reason demand is futile.

121. Additionally, Defendant Bowles cannot render an independent decision because Bowles relationship with the Company prevents her from disinterestedly considering a demand. Defendant Bowles is the Chairman of Springs Industries, Inc. Springs Industries, Inc. and its subsidiaries have all benefitted from extensions of credit from JP Morgan. Defendant Bowles therefore is not independent of Defendant Dimon, who as CEO is in a position to influence the

extension of credit to companies with which Bowles is affiliated. Thus, Defendant Bowles cannot independently consider a demand and demand is futile.

### Demand is Futile as to Defendant Burke

122. Defendant Burke faces a substantial likelihood of liability for his individual misconduct. Defendant Burke was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Burke faces a substantial likelihood of liability. For this reason demand is futile.

123. Additionally, Defendant Burke cannot render an independent decision because Defendant Burke is the Executive Vice President of Comcast Corporation. Comcast Corporation and its subsidiaries have benefitted from extensions of credit provided by JP Morgan. JP Morgan has also made charitable contributions to organizations where Burke served as an officer or trustee. For this additional reason demand is futile.

### Demand is Futile as to Defendant Cote

124. Defendant Cote faces a substantial likelihood of liability for his individual misconduct. Defendant Cote was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the

Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Cote faces a substantial likelihood of liability. For this reason demand is futile.

125. Defendant Cote is also a member of the Risk Policy Committee. As such, Defendant Cote was responsible for informing himself adequately regarding and taking appropriate action in response to the higher levels of risk posed by changes to the Company's VaR and the riskier CIO trading strategy, and once informed regarding the risks and losses had a duty to disclose this material information to shareholders. Defendant Cote violated his fiduciary duty to do so and is therefore faces a substantial likelihood of liability. For this reason demand is futile.

126. Defendant Cote is also Chairman and Chief Executive Officer of Honeywell International Inc. and as such has benefitted indirectly from extensions of credit provided by JP Morgan to Honeywell and its subsidiaries. Further, JP Morgan purchases building safety and security equipment and maintenance services from Honeywell. Because of this, Defendant Cote is not fully independent of the Company or Defendant Dimon, who as CEO is in a position to influence both extensions of credit and the purchase of safety, security and maintenance services. Defendant Cote is therefore not fully independent; for this additional reason demand is futile.

***Demand is Futile as to Defendant Crown***

127. Defendant Crown faces a substantial likelihood of liability for his individual misconduct. Defendant Crown was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and

other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Crown faces a substantial likelihood of liability. For this reason demand is futile.

128.     Defendant Crown also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Risk Policy Committee. As such, Defendant Crown was responsible for informing himself adequately regarding and taking appropriate action in response to the higher levels of risk posed by changes to the Company's VaR and the riskier CIO trading strategy, and once informed regarding the risks and losses had a duty to disclose this material information to shareholders. Defendant Crown violated his fiduciary duty to do so and therefore faces a substantial likelihood of liability. For this reason demand is futile.

129.     Defendant Crown is also president of Henry Crown and Company, a family-owned investment company. Defendant Crown has benefitted from extensions of credit provided by JP Morgan to Henry Crown and Company and other Crown family owned entities. Further, JP Morgan leases office space and retail space from subsidiaries of companies in which Mr. Crown and members of his immediate family have indirect ownership interests.

130.     In addition, Defendant Crown has indirectly benefitted from charitable contributions by JP Morgan to organizations Crown served as an officer or trustee. For these reasons also Defendant Crown is not fully independent of Defendant Dimon and demand is futile as to Defendant Crown.

***Demand is Futile as to Defendant Futter***

131. Defendant Futter faces a substantial likelihood of liability for her individual misconduct. Defendant Futter was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, she reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Futter faces a substantial likelihood of liability. For this reason demand is futile.

132. Defendant Futter also faces a substantial likelihood of liability for breaching her fiduciary duties as a member of the Company's Risk Policy Committee. As such, Defendant Futter was responsible for informing herself adequately regarding and taking appropriate action in response to the higher levels of risk posed by changes to the Company's VaR and the riskier CIO trading strategy, and once informed regarding the risks and losses had a duty to disclose this material information to shareholders. Defendant Futter violated her fiduciary duty to do so and therefore faces a substantial likelihood of liability. For this reason demand is futile.

133. Defendant Futter has also benefitted from extensions of credit provided by JP Morgan directly to her and has benefitted indirectly from extensions of credit by JP Morgan to charitable organizations where Defendant Futter served as an officer or trustee. JP Morgan has also made charitable contributions to organizations where Defendant Futter served as an officer or trustee. For these reasons as well, Defendant Futter is not fully independent of Defendant Dimon, as Dimon is in a position to influence both the extension of credit and the Company's charitable contributions. For this reason as well demand is futile.

*Demand is Futile as to Defendant Gray*

134.    Defendant Gray faces a substantial likelihood of liability for his individual misconduct. Defendant Gray was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Gray faces a substantial likelihood of liability. For this reason demand is futile.

135.    Defendant Gray also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee. As an Audit Committee member, Defendant Gray was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he failed and/or refused to do so during the Relevant Period when Defendant Dimon and others made false and misleading statements and failed to disclose material risks that caused the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile.

136.    In addition, JP Morgan has made charitable contributions to organizations where Defendant Gray served as an officer or trustee. For these reasons as well, Defendant Gray is not fully independent of Defendant Dimon, as Dimon is in a position to influence the Company's charitable contributions. For this reason as well demand is futile.

*Demand is Futile as to Defendant Jackson*

137. Defendant Jackson faces a substantial likelihood of liability for his individual misconduct. Defendant Jackson was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements during the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Jackson faces a substantial likelihood of liability. For this reason demand is futile.

138. Defendant Jackson also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee, and thus bears an even higher standard of duty due to the responsibilities specifically delegated to those committee members on the Company's Board. As an Audit Committee member, Defendant Jackson was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he failed and/or refused to do so during the Relevant Period when Defendant Dimon and others made false and misleading statements and failed to disclose material risks, which caused the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile.

139. Defendant Jackson has also benefitted from extensions of credit provided by JP Morgan directly to him. Defendant Dimon, as CEO, is in a position to influence the extension of credit so Defendant Jackson is not fully independent of Defendant Dimon and cannot independently consider a litigation demand that could result in liability for Dimon as well as Jackson. For this reason also demand is futile.

### *Demand is Futile as to Defendant Novak*

140. Defendant Novak faces a substantial likelihood of liability for his individual misconduct. Defendant Novak was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements during the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Novak faces a substantial likelihood of liability. For this reason demand is futile.

141. Further, Defendant Novak is the Chairman and CEO of Yum! Brands, Inc. JP Morgan has provided extensions of credit to Yum! Brands and its subsidiaries. Defendant Dimon, as CEO, is in a position to influence the extension of credit so Defendant Novak is not fully independent of Defendant Dimon and cannot independently consider a litigation demand that could result in liability for Dimon as well as Novak. For this reason also demand is futile.

### *Demand is Futile as to Defendant Raymond*

142. Defendant Raymond faces a substantial likelihood of liability for his individual misconduct. Defendant Raymond was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and complete. Instead, he reviewed and authorized the publication of materially false and misleading statements during the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary

duty, for which Defendant Raymond faces a substantial likelihood of liability. For this reason demand is futile.

### Demand is Futile as to Defendant Weldon

143. Defendant Weldon faces a substantial likelihood of liability for his individual misconduct. Defendant Weldon was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true and complete. Instead, he reviewed and authorized the publication of materially false and misleading statements during the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Weldon faces a substantial likelihood of liability. For this reason demand is futile.

144. Further, Defendant Weldon is the Chairman and CEO of Johnson and Johnson Company. JP Morgan has provided extensions of credit to Johnson and Johnson Company and its subsidiaries. Defendant Dimon, as CEO, is in a position to influence the extension of credit so Defendant Weldon is not fully independent of Defendant Dimon and cannot independently consider a litigation demand that could result in liability for Dimon as well as Weldon. For this reason also demand is futile.

### Demand is Futile as to All Directors for Additional Reasons

145. Because Defendant Dimon is the sole member of JP Morgan's Stock Committee, Dimon has the sole privilege of recommending to the Board the issuance of stock or the grant of stock option rights. In a financial services company such as JP Morgan, stock issuance and stock options can represent a significant part of executive and officer and director compensation

and a powerful incentive for allegiance thereby. Because every other Individual Defendant is dependent on Defendant Dimon for access to this incentive, no other Individual Defendant can be considered completely independent of Defendant Dimon.

146. In addition, as alleged above, all Individual Defendants who were members of the Audit Committee or the Risk Policy Committee had the explicit responsibility to oversee the risk exposure to the Company and its shareholders, and thus bear an even higher standard of duty due to the responsibilities specifically delegated to those committee members by the Company's Board. Those Individual Defendants were informed of the greater risk exposure yet failed and/or refused to carry out these responsibilities during the Relevant Period, when the Company was exposed to materially greater risk of loss, when the risk was known to the Individual Defendants but not to investors, and when Defendants issued false and misleading statements, failed to correct those statements, and failed to disclose those material risks, thereby causing the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile as to each of these Individual Defendants.

147. If JP Morgan's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by JP Morgan against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of JP Morgan, there would be no D&O Insurance protection, and thus, this is a further reason why

they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

148.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting JP Morgan by prosecuting this action. Therefore, demand on JP Morgan and its Board is futile and is excused.

149.    JP Morgan has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The Individual Defendants owed and owe JP Morgan fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe JP Morgan the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

152.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

153.     The Individual Defendants each knowingly, recklessly or negligently approved the implementation of trading strategies that exposed the Company to increased trading risk, and further approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

154.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JP Morgan has sustained significant damages. As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

155.     Plaintiff, on behalf of JP Morgan, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Unjust Enrichment

156.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of JP Morgan.

158.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to JP Morgan.

159.     Plaintiff, as a shareholder and representative of JP Morgan, seeks restitution from these Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

160.     Plaintiff, on behalf of JP Morgan, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.        Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.        Directing JP Morgan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JP Morgan and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to provide for immediate management notice and corrective action in the event that any trading or other activities expose the Company to unacceptable exposure or risk levels;

- a provision to permit the shareholders of JP Morgan to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of JP Morgan's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions.

C.        Awarding to JP Morgan restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses to the extent provided by law; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: May 15, 2012

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON
250 West 57th Street, Suite 1316
New York, NY 10107
Telephone:  (212) 810-2430
Facsimile:  (212) 810-2427

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*

## VERIFICATION

I, James Baker, hereby verify that I am a shareholder of JP Morgan Chase & Co. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: ___5/14/12___

_James Baker_
James Baker