UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————————— x | | |
| In re JPMORGAN CHASE & CO. DERIVATIVE LITIGATION | : : : | Lead Case No. 1:12-cv-03878-GBD (Derivative Action) |
| ———————————————————— | : : | AMENDED VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF |
| This Document Relates To: | : : | FIDUCIARY DUTY AND UNJUST |
| ALL ACTIONS. | : : | ENRICHMENT |
| ———————————————————— x | | |

797585_1

## OVERVIEW OF THE ACTION

1.      By and through undersigned counsel, plaintiff Wayne County Employees' Retirement System ("plaintiff") brings this consolidated shareholder derivative action on behalf of JPMorgan Chase & Co. ("JPMorgan" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and aiding and abetting thereof.[1]

2.      On Thursday, May 10, 2012, JPMorgan's Chief Executive Officer ("CEO") James S. Dimon disclosed for the first time that the Company had incurred a trading loss over the last several months of approximately two billion dollars.  Dimon said the cause was a "failed hedging strategy." Neither of these statements was true.

3.      Dimon and the other defendants have since admitted that the actual amount of losses is at least $6 billion, and may be larger.  And the cause of the losses was not a "hedging strategy," failed or otherwise, but a deliberate plan to indulge in risky financial gambles, out of the sight of regulatory authorities and without SEC-required disclosure to investors.

---

[1]      Plaintiff makes these allegations upon personal knowledge as to those allegations concerning plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by JPMorgan and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, postings on JPMorgan's website concerning the Company's public statements; and (d) review of other publicly available information concerning JPMorgan and the Individual Defendants (defined herein).  James Baker, the plaintiff in *Baker v Dimon, et al*., Case No. 12-CV-3878, is no longer a shareholder of JPMorgan and therefore filed a notice of withdrawal on December 17, 2012.

4.     Dimon admitted that he and the other Individual Defendants were "'sloppy, . . . stupid, . . . [exercised] bad judgment, . . . took far too much risk,'" and the losses they caused JPMorgan to suffer "should never have happened."  It was a disingenuous admission.

5.     What Dimon did not disclose was that the massive and ongoing losses were the predictable result of the undisclosed conversion of a unit within the Company from a conservative risk-reduction function to a short-term trading enterprise in which traders were rewarded for disregarding risk limits and taking huge risks with investors' money, exposing the Company to large losses instead.

6.     That unit, the Chief Investment Office (the "CIO"), was consistently described to investors, including in the Company's annual reports filed with the SEC on Forms 10-K, as existing to "hedge structural risks and invest to bring the company's assets and liabilities into better alignment."  The unit's focus was supposed to be "managing long-term structural [assets and] liabilities"; defendants explicitly stated that it was "not focused on short-term profits."

7.     At all times relevant to this action that description was patently false.  The Individual Defendants were fully aware of the shift in the Company's risk posture, the mutation of the CIO's mission and trading practices, and the fact that large-scale losses could be and were being incurred. They chose to conceal this material information from shareholders, even as losses were mounting and multiple regulatory authorities initiated investigations into the Company's trading practices. Defendants went so far as to deliberately alter an important regulatory indicator in order to hide the increasing losses.

8.     This action therefore arises out of the Individual Defendants' decision to radically alter the Company's investment risk exposure, or to condone that shift, to conceal this major change in risk exposure from shareholders, to further conceal the large-scale losses that the Company was

- 2 -

incurring as a result of the increased risk exposure, and to issue, or condone the issuance of, materially false and misleading statements between February 2010 and May 10, 2012 (the "Relevant Period").

9.     When the defendants revealed the truth about the Company's investment losses, JPMorgan's stock price plummeted $3.68 from $40.65 to $36.97, or over 9%, in a single day, on extraordinarily high trading volume.  Over $14 billion in shareholder equities was wiped out in less than 24 hours.  By the time the market fully digested the consequences of the deception, $31 billion in shareholder equity had been destroyed.

10.    Because the full extent of the risks and the mounting losses were deliberately concealed and therefore never properly accounted for under Generally Accepted Accounting Principles ("GAAP"), the Company was later forced to restate its earnings, reducing the Company's previously reported net income for the first quarter of 2012 by $459 million.  That restatement further damaged the Company and its reputation, while Individual Defendants benefited by tens of millions of dollars, from the scheme.

11.    JPMorgan's Board of Directors (the "Board") has not, and will not commence litigation against the Individual Defendants or initiate an investigation of the allegations herein, because the Board members themselves face a substantial likelihood of civil, criminal, and financial liability to JPMorgan for authorizing and for failing to correct the change in trading risk exposure, failing to timely disclose the trading losses, and making and/or condoning the issuance of the false and misleading statements alleged herein.  Accordingly, a pre-suit demand upon the JPMorgan Board is excused as a useless and futile act.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. §1332, as there is complete diversity between plaintiff and defendants, and the amount in controversy exceeds $75,000.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that is headquartered in New York, New York, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by the New York courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

14.     Venue is proper in this Court pursuant to 28 U.S.C §1391, as one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to JPMorgan, occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

15.     Plaintiff Wayne County Employees' Retirement System is and continuously has been a shareholder of JPMorgan at all times relevant to this action. Wayne County Employees' Retirement System is a citizen of the state of Michigan.

16.     Defendant JPMorgan is a Delaware corporation with principal executive offices located at 270 Park Avenue, New York, New York 10017.  JPMorgan is a publicly held company, listed on the New York Stock Exchange.  As of January 31, 2012, the number of shares of common stock outstanding was 3,817,360,407.

17.     JPMorgan is a financial services and investment company.  JPMorgan provides various financial services worldwide.  Its Investment Bank segment offers various investment banking products and services, including advising on corporate strategy and structure, capital-raising in equity and debt markets, risk management, market-making in cash securities and derivative instruments, prime brokerage, and research services for corporations, financial institutions, governments, and institutional investors.  The Company's Commercial Banking segment provides lending, treasury, investment banking, and asset management services to corporations, municipalities, financial institutions, and not-for-profit entities.  Its Treasury and Securities Services segment offers cash management, trade, wholesale card, and liquidity products and services to small and mid-sized companies, multinational corporations, financial institutions, and government entities.  This segment also holds, values, clears, and services securities, cash, and alternative investments for investors and broker-dealers; and manages depositary receipt programs.  The Company's Asset Management segment provides investment and wealth management services to institutions, retail investors, and high-net-worth individuals.  This segment offers investment management in equities, fixed income, real estate, hedge funds, private equity, and liquidity products, as well as trust and estate, banking, and brokerage services to high-net-worth clients; and retirement services for corporations and individuals.  Its Retail Financial Services segment offers consumer and business, and mortgage banking products and services that include checking and savings accounts, mortgages, home equity and business loans, and investments.  The Company's Card Services and Auto segment provides payment processing and merchant acquiring services.

18.     Defendant Dimon is JPMorgan's CEO and Chairman of the Board.  He has been a director since 2005.  By the Company's admission, Dimon is an "inside" director.  Dimon signed and certified each of the Company's 10-K and 10-Q forms during the Relevant Period.  Dimon also

participated in earnings conference calls and published shareholders' annual letters during the Relevant Period.  All of these public statements contained false and misleading misrepresentation that were known to be false when made.  Dimon is the sole member of JPMorgan's Stock Committee and is therefore the only Director who can recommend issuance of stock or stock rights options to the Company's Board.  Between 2005 and 2010, Dimon took over $140 million in compensation from the Company.  Defendant Dimon signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Dimon is a citizen of New York.

19.     Defendant James A. Bell has been a director of JPMorgan since 2011, and is a member of JPMorgan's Audit Committee.  Defendant Bell signed the materially false and misleading JPMorgan annual report on Form 10-K filed with the SEC in 2012.  Bell is a citizen of Illinois.

20.     Defendant Crandall C. Bowles has been a director of JPMorgan since 2006 and is a member of the Audit Committee.  Between 2006 and 2011, Bowles received over $1.0 million in compensation from JPMorgan.  Defendant Bowles signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Bowles is a citizen of North Carolina.

21.     Defendant Stephen B. Burke has been a director of JPMorgan since 2003.  He is on the Corporate Governance and Nominating Committee and the Compensation and Management Development Committee.  Defendant Burke has been Executive Vice President of Comcast Corporation since January 2011.  Between 2005 and 2011, Burke received over $1.5 million in compensation from JPMorgan.  Defendant Burke signed the materially false and misleading

JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012. Burke is a citizen of Pennsylvania.

22.     Defendant David M. Cote has been a director of JPMorgan since July 2007 and is a member of the Risk Policy Committee. Between 2007 and 2011, defendant Cote received over $1.0 million in compensation from JPMorgan. He is Chairman and CEO of Honeywell International Inc. Defendant Cote signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012. Cote is a citizen of New Jersey.

23.     Defendant James S. Crown has been a director of JPMorgan since 1991 and is a member of the Risk Policy Committee. Crown is president of Henry Crown and Company, a family-owned investment company. Defendant Crown signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012. Between 2005 and 2011, Crown received over $1.6 million in compensation from JPMorgan. Crown is a citizen of Illinois.

24.     Defendant Ellen V. Futter has been a director of JPMorgan since 1997 and is a member of the Risk Policy Committee. Between 2005 and 2011, Futter received over $1.7 million in compensation from JPMorgan. Defendant Futter signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012. Futter is a citizen of New York.

25.     Defendant William H. Gray, III was a director of JPMorgan from 1992 until May 14, 2012, and was a member of the Audit Committee. Between 2005 and 2011, Gray received over $1.5 million in compensation from JPMorgan. Defendant Gray signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012. Gray is a citizen of Virginia.

26.     Laban P. Jackson, Jr. has been a director of JPMorgan since 1993. He is a member of the Audit Committee.  Jackson is the Chairman and CEO of Clear Creek Properties, Inc., a real estate development company.  Between 2005 and 2011, Jackson received over $1.8 million in compensation from JPMorgan.  Defendant Jackson signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Jackson is a citizen of Florida.

27.     David C. Novak was a director of JPMorgan until May 2012.  Defendant Novak is the Chairman and CEO of Yum! Brands, Inc.  Novak was on the Corporate Governance Committee and the Compensation & Management Development Committee.  Between 2005 and 2011, Novak received over $1.6 million in compensation from JPMorgan.  Defendant Novak signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Novak is a citizen of Florida.

28.     Lee R. Raymond has been a director of JPMorgan since 1987.  Raymond is on the Corporate Governance Committee and the Compensation & Management Development Committee.  Between 2005 and 2011, Raymond received over $1.7 million in compensation from JPMorgan.  Defendant Raymond signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Raymond is a citizen of Texas.

29.     William C. Weldon has been a director of JPMorgan since 2005.  Defendant Weldon is Chairman and CEO of Johnson & Johnson Company.  Defendant Weldon is a member of the Corporate Governance Committee and the Compensation & Management Development Committee.  Between 2005 and 2011, Weldon received over $1.3 million in compensation from JPMorgan.  Defendant Weldon signed the materially false and misleading JPMorgan annual reports on Form 10-K filed with the SEC in 2010, 2011, and 2012.  Weldon is a citizen of Pennsylvania.

30.     Defendant Douglas L. Braunstein has been the Chief Financial Officer ("CFO") and Executive Vice President of JPMorgan from June 22, 2010 until January 1, 2013 when he will transition to a Vice-Chairman position.  Braunstein signed and certified the Company's 10-K and 10-Q forms issued during his tenure during the Relevant Period.  Braunstein also participated in and spoke during earnings conference calls during the Relevant Period.  All of these public statements contained false and misleading misrepresentation that were known to be false when made. Braunstein is a citizen of New York.

31.     Defendant Ina Drew was the CIO of JPMorgan from 2005 until May 2012.  Drew ostensibly managed the CIO and was directly in the chain of command that directed the CIO traders to engage in the trades described herein.  Drew was terminated on May 13, 2012, reportedly due to her role in the crisis.  In 2010 and 2011 alone JPMorgan paid Drew over $20 million.  The Company has since indicated it intends to "claw back" some or all of these funds. Drew is a citizen of New Jersey.

32.     All defendants except JPMorgan are sometimes collectively referred to herein as the "Individual Defendants."  All defendants other than JPMorgan and defendants Braunstein and Drew are sometimes collectively referred to herein as the "Director Defendants."

## SUBSTANTIVE ALLEGATIONS

33.     In a conference call on May 10, 2012, defendants Dimon and Braunstein shocked investment analysts and the market when they announced that JPMorgan's CIO lost over $2 billion dollars on risky trades ostensibly conducted as part of the CIO's purported risk-reduction "hedging" function.

34.    The true losses were later revealed to be over $6 billion, and the trades underlying these massive losses were not the conservative investment hedges that investors were promised, but instead were stunningly risky bets on complex, esoteric, and illiquid financial derivatives.

35.    Directed by the Individual Defendants, JPMorgan had at all times during the Relevant Period promised its investors "strong financial discipline" matched with "superior – not just average – risk management." The Company further promised investors it would "[m]aintain a strong system of internal governance and controls," and touted the CIO as the cornerstone of that system.

36.    Defendants represented to shareholders that JPMorgan had a "commitment to world-class risk management practices," a culture of "'no surprises'" and "early escalation." They claimed that the Company had the "robust risk management discipline to capture, monitor, and control the risks created by its business activities."

37.    Due in part to its advertised expertise and discipline in risk management, JPMorgan's stock enjoyed a "risk reputation" premium. Analysts at Susquehanna Capital observed that "[o]ur target multiple [for JPMorgan] represents a 20% premium to where we would expect other very large banks to trade, but we believe JPM will be accorded a premium multiple by virtue of its overall management strength and superior record of risk management."

38.    Dimon assured shareholders of the reliability of the Company's conservative investment strategy with this saying: "[a]ny company can improve earnings in the short run by taking on additional risk . . . . But it may be the kind of growth one comes to regret."

39.    But that is exactly what the defendants caused JPMorgan to do. With the Individual Defendants' approval, Dimon converted the CIO from a conservative risk management unit into a wild-west trading desk where aggressive traders took unsupervised and unmanageable risks in ever more-complex financial instruments, exposing the Company to unnecessary risk in order to swell

short-term profits at the expense of long-term investment safety.  According to former JPMorgan employees, Dimon personally conceived and directed the alteration of the CIO's principal function.

40.    All the while, defendants maintained to investors that the CIO was the unit within the Company responsible for "hedging," or reducing the risk from, other Company investments.  A hedge is an investment made to reduce the risk of adverse price movements in an asset already owned.  A simple example of a true hedge is the purchasing of an option to sell a currently-owned stock at a fixed future price.  If the stock price should subsequently drop, that risk is hedged by the option to sell.

41.    Beginning in 2007 or earlier, however, the Individual Defendants knew that under Dimon's direction the CIO's mission had been altered from risk management to proprietary trading, in order to generate risky short-term profits, rather than to hedge the Company's exposure on other investments.

42.    In pursuit of this covert goal, Dimon and the other defendants demoted CIO risk managers and replaced them with derivatives traders, increased the CIO's trading budgets many times over and, over time, lifted the last vestiges of risk controls from the CIO trading operation.

43.    According to a June 2012 Bloomberg report, at least two senior JPMorgan executives raised alarms regarding the increased risk exposure from CIO trading as early as 2009.

44.    Bill Winters and Steven Black, then co-CEO's of JPMorgan's Investment Bank unit, questioned the adequacy of risk management for the CIO and sought the imposition of formal risk oversight and controls.

45.    According to Bloomberg, Dimon not only ignored these recommendations but fired Winters and relieved Black of operating responsibility.

- 11 -

46.     The CIO was a particularly attractive structure within the Company for the Individual Defendants to indulge in the increasingly risky trades, as its reputation and presumed function allowed it to "fly under the radar" with respect to regulatory oversight.

47.     While U.S. financial regulatory authorities had, according to *The New York Times*, approximately 110 staff stationed at various JPMorgan offices to monitor financial risk, none of these were stationed at the CIO because authorities believed that that office would never take positions that were large enough or risky enough to require regulatory oversight.

48.     Thus, out of sight of financial regulators, defendants arranged for the CIO to take on riskier and riskier trades in pursuit of short-term trading profits.  The traders and the defendants would take a percentage of those profits as incentive compensation – while the inevitable losses would be the shareholders' problem.

49.     As reported to Bloomberg on April 13, 2012, new traders hired into the CIO were selected not for risk management expertise but rather for their experience in aggressive, risk-seeking derivatives trading, and were incentivized and rewarded for doing just that.  Reuters reported that the compensation for CIO personnel was directly linked to the profits they generated – not the risks they avoided – further encouraging these already aggressive traders to continually seek out greater short-term risks in order to reap short-term monetary rewards.

50.     At the same time, JPMorgan executives whose responsibilities included awareness and management of risk in the CIO were being systematically ignored, transferred, demoted, or simply kept out of the loop regarding the CIO trading activities and positions.

51.     Thus, with internal risk controls lifted, internal risk management personnel either demoted, fired, or given marching orders to ignore the increased risk, and regulatory authorities

- 12 -

decoyed away, the trades, positions, and size of the financial risks the CIO traders incurred rapidly grew.

52.     Between the end of 2007 and the second quarter of 2012, defendants authorized an over five-fold increase in the CIO's trading portfolio, from $76 billion to $359 billion, larger than any other single business unit in the Company after the Investment Bank.

53.     By early 2012, traders in the CIO had amassed positions so large they were distorting the credit markets. One trader in particular began amassing positions so huge he earned the nickname, "The London Whale."

54.     The ballooning in the CIO's derivatives portfolio and risk exposure should have, but did not, trigger a corresponding risk management response from the Company's vaunted "risk management systems." Those burgeoning risks were indeed reported up through the chain of command, but appropriate risk management corrective actions were never instituted.

55.     In fact, as early as 2010, a senior JPMorgan executive, apparently on his own initiative, prepared a report indicating that the Company needed to create a loss-reserve of between $2 billion and $4 billion in order to self-insure against losses in the CIO's risky portfolio. Defendants, in possession of this warning, declined to create any such reserve, and never informed investors of either the need for such reserves or the fact that JPMorgan continued to operate without the needed reserve.  Further, because creating the indicated reserve would reduce the Company's reported earnings, the Company's net income was likely overstated by billions of dollars throughout the Relevant Period.  For example, in 2010, the Company reported net income of $1.258 billion for the Corporate Division and $17.37 billion for the entire Company.  Thus, establishing even the minimum required reserve of $2 billion in 2010 would have wiped out all of the profits reported by the Corporate Division, and reduced the overall company profit by almost 12%.

- 13 -

56.     Even if the defendants were not required to establish a loss reserve, at a minimum full disclosure of the risks inherent in the new CIO trading function was required under SEC regulations and GAAP.

57.     The SEC Regulations S-K required the Company to furnish in its Form 10-K and Form 10-Q, under Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), all of the information set forth in Item 303.  *See* 17 C.F.R. §229.303.  Item 303 required defendants to "[d]escribe any known trends or uncertainties that have had or that the [Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

58.     Under SEC regulations, JPMorgan's 10-K and 10-Q disclosures were required to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

59.     The altered CIO focus on short-term, risky trading was a known trend entailing material uncertainty.  The Individual Defendants knew that this activity was inconsistent with the Office's official function and was unsustainable.  The material uncertainty was the magnitude of losses that would eventually and inevitably be incurred.  Defendants also knew that reported financial information, which omitted both the unacceptable risk that the CIO had incurred and actual losses that had been concealed, would not be indicative of future operation results.

60.     The SEC has further elaborated on the reason for requiring these disclosures:

> The [Securities and Exchange] Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

- 14 -

Securities Act Release No. 33-67111, 1987 SEC LEXIS 2001, at *6-*7 (Apr. 24, 1987).

61.      Defendants' numerical presentation and MD&A of revenues during the Relevant Period was not merely incomplete, it was knowingly misleading, a fact that JPMorgan conceded when it was forced to restate its earnings in 2012.

62.      In the months leading up to the time the massive losses finally became impossible to conceal any longer, in order to disguise the magnitude of the risk that the CIO was incurring, at Dimon's direction a vital regulatory risk management measure, the Value at Risk ("VaR") was deliberately altered.

63.      VaR is a modeled, calculated figure that is supposed to communicate to traders, management, regulators and investors the maximum expected loss from a given trading position or portfolio.  The VaR figure predicts expected portfolio losses over a given time period and at a certain confidence level, given certain assumptions about the investment climate and the behavior of different types of investments.  A VaR of $50 million for a given portfolio would represent that in 95 of 100 expected trading days, that portfolio would suffer maximum losses of no more than $50 million dollars.

64.      JPMorgan described VaR in its 2011 Form 10-K as follows:

> JPMorgan Chase utilizes VaR, a statistical risk measure, to estimate the potential loss from adverse market moves.  Each business day, as part of its risk management activities, the Firm undertakes a comprehensive VaR calculation that includes the majority of its material market risks. VaR provides a consistent cross-business measure of risk profiles and levels of diversification and is used for comparing risks across businesses and monitoring limits. These VaR results are reported to senior management and regulators, and they are utilized in regulatory capital calculations.

65.      The 2011 Form 10-K further described VaR as allowing risk to be measured "across instruments and portfolios in a consistent, comparable way."

66.     According to JPMorgan, VaR figures for JPMorgan's various business units were calculated daily and "reported to senior management and regulators, and . . . regulatory capital calculations" – specifically, the calculation of the amount of capital that the Company was required to keep on hand to support its investment activities.  Investors also depend on published VaR figures to assess expected losses and compare investment choices.

67.     As discussed below, defendants allowed the VaR for the CIO to be exceeded, then suspended, and ultimately stage-managed, all so that CIO traders could continue to make improper, oversize and excessively risky bets without alerting either the regulators or investors.

68.     Traders in the CIO were previously required to operate within specified stop-loss limits of $20 million.  In theory, this required CIO traders to reduce or exit any trading position that caused the CIO to incur expected losses greater or equal to that amount.

69.     Defendants Dimon and Drew, however, removed this risk control from the CIO traders, despite the Company's assurances to investors that the CIO, like all of its business groups, was "responsible for adhering to established limits, against which exposures are monitored and reported."

70.     Without the control of a CIO stop-loss limit, CIO traders continued to increase the size and risk of their bets.  By early 2012, the CIO traders' bets had begun to strain not just the CIO but the Company-wide VaR risk limits.  Shareholders had every right to expect that, in that eventuality, defendants would immediately cause the CIO to reduce its risky positions – to close out the trades and positions that exposed the Company and its investors to outsized risk of losses.

71.     This reasonable expectation, based on the Company's advertised risk controls and defendants' advertised "world-class" risk management, was never met.  Instead, between 2011 and

early 2012 the Individual Defendants conspired to alter the VaR calculation so as to reduce the apparent amount of risk that the CIO had incurred.

72.     Sometime during the first quarter of 2012, Dimon and several other defendants caused the Company to "hack" its VaR calculation – to manipulate JPMorgan's own risk measurement equation – so as to disguise the risks that the CIO's traders were creating for the Company and its investors.

73.     The Individual Defendants' deliberate manipulation of the CIO VaR was key to their ability to continue to conceal the mounting risks from investors.  The new VaR calculation made it appear that the CIO's trading risk in Q1 2012 was unchanged from the previous year, when it had in fact increased by a factor of between *two and three times the previously disclosed figures*.

74.     The new VaR model, which was applied *only to the CIO*, also made it impossible for regulators or investors to make "consistent, comparable" assessments of the risk of the bank's positions across either business units or over time.  The Form 10-K statements regarding the Company's VaR at that time were therefore false and misleading when made.

75.     On February 29, 2012, the Company filed its Form 10-K for 2011 with the SEC.  In its Form 10-K, JPMorgan disclosed a laundry-list of generic risks facing the Company, including Legal Risks, Business and Operational Risk, Regulatory Risk, Market Risk, Credit Risk, Liquidity Risk, and "Other Risks."  None of these mentioned the major change in VaR applied to the CIO that was already in effect, or the CIO's shift from its historic hedging function to risky trading for that matter.

76.     The 2011 Form 10-K discussed the Company's "framework for managing risks." According to the Form 10-K, the VaR for the Company's trading and credit portfolio activities was:

| **Value at Risk (VaR), in $ millions** | **2011** | **2010** |
|---|---|---|
| Total trading VaR | 58 | 71 |
| Credit portfolio VaR | 26 | 33 |
| Total trading and credit portfolio VaR | 76 | 87 |

77.     The February 2012 Form 10-K release never mentioned that the VaR model the Company used was deliberately changed between 2011 and 2012 in order to increase the amount of risk to which Company traders could expose the Company, and that the true VaR was far greater than that shown.  The "disclosure" instead appeared to show a declining risk trend from 2010 to 2011, and did not suggest to investors the truth of the matter: that the Company's VaR was steadily increasing due to the risky trades put on by the CIO, but the VaR measure had been modified to allow traders to expose the Company to far greater risk without revealing that risk to investors through the VaR, and that the Company had sacrificed the hedging and risk-reduction functions of the CIO in the name of gambling on increased short-term trading profits.

78.     But, as early as 2010, the financial risks of these trades had caused responsible executives within the Company to sound alarms and request that internal controls be implemented to reduce the risks.  No such measures were ever implemented, and in fact, JPMorgan employees who expressed their concerns about the risky practices were demoted or terminated.

79.     Specifically, according to a Bloomberg report, the CIO's Chief Risk Officer, Peter Weiland, in 2010 demanded that CIO traders accumulating the large and risky positions be held accountable.  Defendants rebuffed his attempt to apply to the CIO the very risk controls that the Company promised to shareholders.  Weiland continued to argue for risk limits to be applied, up until the time he was demoted in January 2012.  Several of the Individual Defendants removed Weiland, the executive who argued for application of the risk controls promised to shareholders,

- 18 -

from his position as Chief Risk Officer and replaced him with a Mr. Irvin Goldman, a trader whose trading activities at his former firm had led to formal regulatory sanctions.  According to *The Wall Street Journal*, Goldman had no relevant risk management experience, but the Individual Defendants caused him to be placed in the critical risk oversight role for the CIO.

80.     In January 2012, as the risky proprietary trading portfolio ballooned, both CIO and Company-wide theoretical risk limits were eventually breached.  These events should have triggered specific corrective actions, including the reduction or closing of the risk- and loss-producing positions.  Instead, they resulted in the January 15th adoption of a VaR specifically modified to conceal those risks.

81.     The Federal Reserve Board has issued detailed guidance to supervised banking companies maintaining significant trading accounts.  SR 09-01 details requirements for VaR models and changes to VaR models and requires formal approval of any changes to regulatory VaR models.  12 C.F.R. §252.126.  Defendants have not disclosed whether they ever sought formal approval for the VaR changes they implemented in January 2012.

82.     During this time, defendants continually reassured investors in quarterly and annual SEC filings that JPMorgan, and the CIO specifically, was "responsible for adhering to established [risk] limits, against which exposures are monitored and reported."

83.     For example, on February 24, 2010, JPMorgan filed its annual report on Form 10-K for the year ended December 31, 2009 with the SEC.  This February 24, 2010 Form 10-K made the following representations about the CIO:

(a)     "The Chief Investment Office is primarily concerned with managing structural market risks which arise out of the various business activities of the Firm.  These include structural interest rate risk, and foreign exchange risk."

- 19 -

(b)     "[T]he Chief Investment Office manage[s] capital, liquidity, interest rate and foreign exchange risk and the investment portfolio for the Firm."

(c)     "Overlaying the line of business risk management are four corporate functions with risk management-related responsibilities, including the Chief Investment Office, Corporate Treasury, Legal and Compliance and Risk Management."

84.     These statements regarding the CIO in JPMorgan's February 24, 2010 Form 10-K were materially false and misleading because, by the end of 2009, the CIO was not "primarily concerned" with managing risk.  To the contrary, as CIO executive David Olson reported to *Bloomberg*, the CIO was a proprietary trading unit that created substantial risk in order to "ramp up the ability to generate profit for the firm" in accordance with "Jamie's new vision."

85.     The February 24, 2010 Form 10-K also specifically misrepresented the investments made by the CIO, describing those investments as hedges used to manage existing risks.  Specifically, in the context of explaining the CIO's risk management function, the 2009 Form 10-K represented that the "value-at-risk" or "VaR" for the CIO did not reflect additional risk to which JPMorgan was exposed, stating: "The CIO VaR includes positions, primarily in debt securities and credit products, used to manage structural risk and other risks, including interest rate, credit and mortgage risks arising from the Firm's ongoing business activities."

86.     The statement that the CIO took positions to "manage" or hedge existing risks was materially false and misleading because, as explained above, the CIO now operated as a proprietary trading unit that took positions in order to generate profits – not to manage risks.  This statement not only misrepresented the true function and investment activities of the CIO, but also misrepresented the meaning of the CIO's VaR.  Specifically, by stating that the CIO's VaR reflected positions taken to "manage" risk, defendants created the false impression that losses incurred on those positions

- 20 -

would be offset by gains on existing positions elsewhere in the Company.  In other words, defendants asserted that the CIO's VaR did not represent the amount of money the Company could actually lose as a result of trading in the CIO, on a net basis.  In truth, as explained above, the CIO's positions were speculative bets that generated risk, rather than hedges designed to "manage" risk incurred by other departments within JPMorgan.  Moreover, defendants concealed that a significant portion of the CIO's VaR – more than 50% at some points during the Relevant Period – was generated by the CIO's extremely risky portfolio of illiquid synthetic-credit derivatives.

87.     Put simply, these statements were materially false and misleading when made, because they failed to inform shareholders that defendants were exponentially increasing the CIO's allowable risk while simultaneously modifying the VaR to hide this massive risk exposure from shareholders.

88.     The Company eventually admitted that the CIO had "no limits in place to monitor the size, asset type or risk factors" for the largest and riskiest of trading positions that CIO traders entered.

89.     In early April 2012, the CIO's risk profile had become so enormous that questions surfaced among market analysts about trading risk within the CIO.  In fact, reports had emerged around that time that a London-based trader was making trades so large that they were distorting the $10 trillion credit derivatives market.  The size and risk exposure of these trades finally attracted the attention of regulatory authorities, including the SEC and the British financial regulatory authority, but was allowed during this time to continue without interference and without comment by the defendants.

90.     By no later than April 5, 2012, defendants Dimon, Braunstein, and Drew and all of the other Individual Defendants had been fully briefed as to the extent and risk exposure of these

- 21 -

risky positions.  According to *The New York Times*, an internal JPMorgan report estimated that the losses from the CIO derivatives position could exceed $9 billion.

91.     Despite this, according to *The Wall Street Journal*, at the direction of the Individual Defendants, JPMorgan senior executives falsely assured regulators at this time that there was no cause for concern.  Defendants gave no indication that anything was wrong, in their public statements and SEC filings, even up to and including the first-quarter earnings call held April 13, 2012.

92.     On April 13, 2012, defendants held an earnings conference call to discuss the first quarter 2012 results.  The same day, in a press release filed with the SEC, defendants claimed that the CIO's VaR was in line with historical levels for the Office.  Defendants, however, still failed to disclose, either during the call or in the  SEC filing, that the Company had radically altered the CIO investment portfolio to take on much higher short-term risk, that huge losses were beginning to mount, and that the situation could potentially become very serious very quickly.  Defendant Braunstein instead assured investors on that call that the CIO "had that position on for many years" and that the Company was "very comfortable with our positions as they are held today,"  and that the CIO only "invest[ed] . . . in high grade, low-risk securities."  On the same call defendant Dimon, responding to analysts' concerns about rumors of risky trading positions at the CIO, described those concerns as "a complete tempest in a teapot."

93.     Investors and analysts were indeed taken in by these assurances.  Analysts downplayed the media reports, and the stock traded slightly up that day.  Rather than a "tempest in a teapot," however, the risks were very real, were already incurring massive losses, and were a direct result of changes the defendants had made and allowed in the Company's trading risk exposure.  The estimated actual losses by the date of the conference call were already at least $1 billion and growing

- 22 -

rapidly.  During the week following the April 13 conference call, losses from the trades grew by as much as $200 million *per day*.  And rather than being "in line" with historical levels, the VaR had been allowed to balloon to *more than twice the risk previously reported*, concealed by the alterations in the VaR calculations the Individual Defendants had made.

94.     The Individual Defendants were fully informed about the rapidly mounting losses, and held several meetings over the next several weeks to discuss what to do about them.  The Individual Defendants, however, chose to conceal those losses from the investing public until May 10, 2012.

## THE TRUTH COMES OUT

95.     On May 10, 2012, the Individual Defendants released to the SEC a Form 10-Q and initiated another investors' conference call, as they were no longer able to conceal the massive and mounting trading losses at the CIO.

96.     In that Form 10-Q and conference call, the Individual Defendants finally disclosed the following:

> Since March 31, 2012, CIO has had significant mark-to-market losses in its synthetic credit portfolio, and this portfolio has proven to be riskier, more volatile and less effective as an economic hedge than the Firm previously believed. . . .

> The Firm is currently repositioning CIO's synthetic credit portfolio, which it is doing in conjunction with its assessment of the Firm's overall credit exposure. As this repositioning is being effected in a manner designed to maximize economic value, CIO may hold certain of its current synthetic credit positions for the longer term.

97.     Even this disclosure was filled with financial double-speak.  By the phrase, "CIO may hold certain of its current synthetic credit positions for the longer term," the Individual Defendants actually meant that because of the risky and illiquid nature of the trades the CIO had made, certain of

the positions might be impossible to unwind in the near term without multiplying the already-incurred losses astronomically.

98.     Regarding the complex credit derivatives that the CIO had been trading, undisclosed to shareholders, the Form 10-Q included only the following superficial discussion:

> Credit derivatives are financial instruments whose value is derived from the credit risk associated with the debt of a third party issuer (the reference entity) and which allow one party (the protection purchaser) to transfer that risk to another party (the protection seller) when the reference entity suffers a credit event. If no credit event has occurred, the protection seller makes no payments to the protection purchaser.

> As a purchaser of credit protection, the Firm has risk that the counterparty providing the credit protection will default. As a seller of credit protection, the Firm has risk that the underlying entity referenced in the contract will be subject to a credit event. Upon the occurrence of a credit event, which may include, among other events, the bankruptcy or failure to pay by, or certain restructurings of the debt of, the reference entity, neither party has recourse to the reference entity. The protection purchaser has recourse to the protection seller for the difference between the face value of the credit derivative contract and the fair value of the reference obligation at the time of settling the credit derivative contract.

99.     This "explanation" concealed the actual reason the CIO traders had taken on the massive and risky positions in these derivatives: they were managed and incentivized to look for "get rich quick" trades regardless of the potential risk.

100.    Regarding the amount of Credit portfolio activities in the last quarter of 2011 and the first quarter of 2012, the Form 10-Q included the following table, identified as "Use of single-name and portfolio credit derivatives":

| | Notional amount of protection purchased and sold | |
|---|---|---|
| (in millions) | Mar 31, 2012 | Dec 31, 2011 |
| Credit derivatives used to manage: | | |
| Loans and lending-related commitments | $        3,325 | $        3,488 |
| Derivative receivables | 26,347 | 22,883 |
| **Total protection purchased** | **29,672** | **26,371** |
| Total protection sold | **100** | **131** |

- 24 -

| | | | |
|---|---|---|---|
| Credit derivatives hedges notional, net | $ | 29,572 | $   26,240 |

101.    The May 10, 2012 Form 10-Q also disclosed for the first time that there had been a significant increase in VaR associated with trading activities in the CIO in the first quarter.  The 10-Q stated:

**First-quarter 2012 VaR results**

*          *          *

CIO VaR averaged $129 million for the three months ended March 31, 2012, compared with $60 million for the comparable 2011 period.  The increase in CIO average VaR was due to changes in the synthetic credit portfolio held by CIO as part of its management of structural and other risks arising from the Firm's on-going business activities.

102.    This form disclosure and conference call, however, disclosed neither the extent of the risk to which the new trading approach had exposed the Company nor the fact that the increase in risk had been intentional and planned, as a vehicle to gamble on short-term trading profits and not, as the 10-Q claimed, for "management of structural and other risks."

103.    On the May 10, 2012 conference call, defendant Dimon admitted that "[t]hese were egregious mistakes.  They were self-inflicted, we were accountable, and what happened violates our own standards and principles."  Dimon announced that one segment of the Company's guidance would have to be revised from "approximately plus or minus $200 million [to an estimated] minus $800 million after-tax" and that an additional $1 billion in losses might be expected.

104.    Dimon, responding to questions, admitted that the trading strategy leading to the losses was "flawed, complex, poorly reviewed, poorly executed, and poorly monitored."  Dimon said, "[w]e took far too much risk.  The strategy we had was barely vetted, it was barely monitored. It should never have happened."

105.     Dimon's answers to analysts' questions regarding "who knew, and when they knew" about the huge losses were still evasive, however.  An analyst on the call asked, "[j]ust curious on when this was caught, if it was caught internally or caught by a regulator . . . ?"

106.     Dimon's response was oblique at best: "You should assume that we try to keep our regulators up to date about what we know and when we know it, and this is a constant practice of the Company.  When I said it was caught, we started digging into this more and more, mostly because we were bearing big losses in the second quarter.  And of course, when you start to see something like that you act.  Probably, obviously, we should have acted sooner."

107.     Dimon did not answer the question.  If he had, and done so honestly, investors would have learned that defendants knew of the risk and losses long before they disclosed them.

108.     The May 10, 2012 conference call included the following exchanges during the question and answer segment:

> Analyst Brennan Hawken:  "Okay, and you had mentioned that this was a new strategy that you had decided to exit. Is it possible for you to let us know how new that strategy was?"

> Jamie Dimon:  "Not new.  It was, I said new but what I meant it was the strategy to reduce the credit hedge. So it's kind of a new strategy was devised and I already said it was poorly constructed and poorly monitored, all of that. And that took place over the course of the last couple of months."

109.     Dimon's response failed to disclose the fact that the CIO's "new" risk-seeking strategy had been deliberately implemented by Dimon several years previously, and expressly and tacitly approved by the other Individual Defendants, in order to allow the CIO to make highly risky trades without regulatory or investor oversight.  Dimon had been personally involved in creating and implementing the new trading strategy and had personally encouraged traders to take on greater risk in service of the short-term profits he had assured investors that JPMorgan would shun.

110.     The conference call also included the following exchanges:

- 26 -

<u>Analyst Mike Mayo</u>:  "You said you had some smaller losses in the first quarter. Even in retrospect, were there any signs that perhaps you should have paid more attention to, looking back?"

<u>Dimon</u>: "Yes, in retrospect, yes."

<u>Mayo</u>:  "And what would those be?"

<u>Dimon</u>:  "Trading losses.  There was some stuff in the newspaper and a bunch of other stuff. Hindsight is – even hindsight is not 20/20 but with hindsight, yes, obviously we should have been paying more attention to it."

<u>Analyst Keith Horowitz</u>: ". . . do you feel that the hedge put on or the position put on, was the intention really to kind of hedge?  Or do you feel like the person who put it on, his intention for profits or to take money?"

<u>Dimon</u>:  "It had been on for a long time.  It actually made money.  I don't want to talk about what it did. It actually did quite well.  It was there to deliver a positive result in a credit-stressed environment and ***we thought we could do that and make some net income***."

111.    Defendant Dimon later admitted that he was "dead wrong" to ignore the concerns that analysts and regulators raised over the bank's trading practices in early April.

112.    The Individual Defendants also did not disclose, in the corresponding 10-Q or during the conference call, that both United States and British regulators had been in discussions with JPMorgan about the suspect trading activity ***for nearly a month before the Company ever mentioned the risk exposure or losses to investors***.

113.    Financial analysts who followed the Company concluded that "it is reasonable to assume a breakdown in the organizational chain stretches from the CIO to the top floor."  (Jason Merriam, Merriam Investor Services).  Other observers noted that, in addition to the obvious financial losses, the bank would suffer a significant reduction in its reputational premium.

114.    On May 11, 2012, in response to the Company's tardy disclosures, the rating agency Fitch Ratings downgraded both JPMorgan's long and short term-term Issuer Debt Ratings.  Fitch placed the Company on a Ratings Watch, stating that the Company's disclosure ". . . raises questions

regarding JPM's risk appetite, risk management framework, practices and oversight . . . . [L]onger-term implications for the firm's reputation are not yet known."

115.    U.S. Senator Carl Levin stated that "[t]he enormous loss JPMorgan announced today is just the latest evidence that what banks call 'hedges' are often risky bets that so-called 'too big to fail' banks have no business making."

116.    According to CNBC, the specific trades that incurred the massive losses involved bets on the future value of a "derivative of a derivative," a credit derivative which was part of the CDX index of credit indices – a multi-billion dollar directional bet on changes in credit risk across a basket of individual credit derivatives.

117.    Analysts asked defendant Dimon why the Company felt it had to add to the Company's exposure to such risky derivative trading. Dimon admitted that the Company "did not have to do this at all" – it did not have to expose shareholders to risk of losses of this magnitude.

118.    The SEC quickly opened an investigation into JPMorgan's accounting practices and public disclosures about the trades, according to sources briefed on the matter.  The inquiry is understood to concern the bank's past regulatory filings about the CIO, the unit that placed the trades, as well as statements regarding those trades from the firm's top executives.

119.    On May 16, 2012, the FBI and DOJ announced that they had begun a criminal investigation into the CIO practices and trading losses.

120.    According to individuals briefed on the matter, the SEC investigation into the CIO is focusing on the Company's accounting methods relating to the trades, how the bank reported risk, and whether changes the Company made to its risk measures were adequately disclosed, while the FBI is investigating whether the CIO trading practices involved market manipulation and falsified records.

121.     Fundamental to the Individual Defendants' scheme to radically alter the Company's trading portfolio without disclosing the magnified risk to investors was the decision to house the risky trading activities within the CIO.

122.     According to Thomas Curry, the head of the U.S. Office of the Comptroller of the Currency ("OCC"), his agency normally would station regulators directly within the unit of a financial institution the size of JPMorgan that was conducting trades with the risk and magnitude of the CIO.   Curry stated that the OCC had not done so because "the CIO activities were not historically considered to be high-risk," and that "a similar level of activity or situation (large hedges that are illiquid and otherwise very complex) is not present in other large national banks. . . . other large banks do not conduct [such] activity."

123.     A primary focus of the SEC investigation, sources said, is the firm's accounting methods relating to the trades including the implementation of the new VaR model, and the role that the model played in masking the risk surrounding those trades.

124.     Defendants later disclosed that the change they had made to the VaR had resulted in *a near-tripling of the estimated risk*, disguised by the changes defendants made in the VaR calculations.

125.     JPMorgan, after disclosing the losses, took the unprecedented step of restating the first-quarter VaR at the CIO.   It was not until that point that investors learned that CIO's VaR was relatively stable throughout 2011, remaining between $55 million and $64 million, but the VaR at the end of the first quarter 2012 was $186 million using the earlier model – three times larger than it had been less than a year earlier.

126.     On January 13, 2012, JPMorgan had announced record net income of over $19 billion for 2011.  Defendants trumpeted that figure in press releases simultaneous with the Company's filing

- 29 -

of its SEC Form 8-K, in slide presentations to investors, and on the fourth quarter earnings conference call.  Defendants never mentioned in the SEC filing, the press releases, the investor presentation, or conference call, that these purported earnings were a temporary artifact, propped up by defendants' risky trading strategies and deliberate decision to conceal the magnitude of financial risk to which they had exposed the Company.

127.     On July 13, 2012, JPMorgan announced that "previously filed financial statements for the 2012 first quarter should no longer be relied upon."  The Company further disclosed that ". . . we have determined that there was a material weakness in our internal control over financial reporting at March 31, 2012 related to CIO's internal controls over valuation of the synthetic credit portfolio."

128.     The massive losses between 2011 and 2012, however, were not the first indication defendants had that the CIO's aggressive trading could expose the Company and its shareholders to huge losses.

129.     According to *The Wall Street Journal*, in 2008 a group of CIO traders lost $1 billion on oversize bets on Fannie Mae and Freddie Mac preferred stock.  This incident was known to defendants well before they allowed the CIO to amass the huge and risky portfolio in the months leading up to the 2011-2012 losses.

130.     In yet another instance, in 2010, CIO traders incurred losses totaling $300 million in just a few days on similarly improper trades.  According to *The Wall Street Journal*, Joseph Bonocore, then the CIO's CFO, concluded that the trades had been made without any corresponding gains to offset the losses, meaning that the trades were not hedges.  Bonocore brought the matter to the attention of Michael Cavanagh, then JPMorgan's CFO, who reported to Dimon.  Dimon was told of the trades, and knew that the trades were not hedges, according to *The Wall Street Journal*.

131.   When JPMorgan announced that it would restate its previously reported financial results for 2012, defendants confessed that the valuation of positions within the CIO during the Relevant Period "lacked integrity" and had been deliberately misstated "to avoid showing the full amount of the losses in the portfolio."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

132.   By reason of their positions as officers, directors, and/or fiduciaries of JPMorgan and because of their ability to control the business and corporate affairs of JPMorgan, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage JPMorgan in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of JPMorgan and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

133.   Each director and officer of the Company owes to JPMorgan and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

134.   Individual Defendants with fiduciary responsibilities for risk policy, for setting incentive compensation, and for the auditing of Company financial statements were either actively involved or complicit in the wrongdoing alleged herein, as discussed below.

**Audit Committee Responsibilities**

135.    In addition to these duties, the members of the Audit Committee owed specific duties to JPMorgan under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings and other press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.   In particular, the Audit Committee's Charter provided as follows:

Duties and responsibilities

The Audit Committee shall have the following duties and responsibilities:

*        *        *

C.        Compliance and regulatory oversight responsibilities

The Audit Committee shall:

- Receive from the General Auditor, periodically, and from management, as appropriate, communications and presentations on significant operating and control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and on the initiation and status of significant special investigations; and initiate such other inquiries into the affairs of the corporation as it deems necessary or appropriate.

- Receive periodic presentations from management and the independent registered public accounting firm on the identification and resolution status of material weaknesses and reportable conditions in the internal control environment, including any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data, and on any fraud, whether or not material, that involves management or other employees who have a significant role in the corporation's internal controls.

*        *        *

- Review regulatory authorities' significant examination reports pertaining to the corporation, its subsidiaries and associated companies.

D.        Financial statement and disclosure matters

The Audit Committee shall:

\*       \*       \*

- Review and discuss, at least quarterly, with management, the independent registered public accounting firm and the General Auditor the annual audited financial statements and quarterly financial statements, including reviewing the corporation's specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operation."

\*       \*       \*

- Discuss with management the corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

- Taking into consideration the Board's allocation of responsibility for review of credit risk, market risk and fiduciary risk to the Board's Risk Policy Committee, discuss with management guidelines and policies for assessing and managing the corporation's exposure to risks, including reputation risk, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

**Risk Policy Committee Responsibilities**

136.    The Risk Policy Committee Charter describes the following responsibilities incumbent on the defendants on that Committee:

- The Risk Policy Committee is responsible for oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk, and is also responsible for review of the corporation's fiduciary and asset management activities.

- The corporation's Chief Risk Officer reports to the CEO and is accountable to the Board of Directors, primarily through the Risk Policy Committee.

<u>Authorities and responsibilities</u>

- The Risk Policy Committee is responsible for oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk. In performing this oversight, the Risk Policy Committee shall:

- review with management guidelines and policies to govern the process for assessing and managing such risks.

- review benchmarks for and major financial risk exposures from such risks.

- 33 -

- receive and review reports from management of the steps it has taken to monitor and control such exposures.

- review management's performance against these policies and benchmarks.

- receive and review reports on selected risk topics as management or the Committee deems appropriate from time to time.

- meet not less than semi-annually with the Audit Committee on topics of common interest.

- meet, through one or more members, not less than annually with the Compensation & Management Development Committee of the Board of Directors to assist that committee in its review of the corporation's compensation practices and the relationship among risk, risk management and compensation in light of the corporation's objectives, including its safety and soundness and the avoidance of practices that would encourage excessive risk.

- approve and periodically review the corporation's Risk Appetite Policy, and review actual or forecast results exceeding risk appetite tolerances.

- approve and annually review the corporation's policies (the "Global Primary Risk Policies") with respect to Risk Management Governance, Capital Management, Liquidity Risk Management, Wholesale Credit Risk Management, Consumer Risk Management (Retail Financial Services and Card Services), Market Risk Management, Principal Risk, Operational Risk Management, and Reputational and Fiduciary Risk Management.

## Compensation & Management Development Committee Responsibilities

137.    According to the Committee Charter, this Committee of the Board is required to:

review the corporation's compensation practices and the relationship among risk, risk management and compensation in light of the corporation's objectives, including its safety and soundness and the avoidance of practices that would encourage excessive risk; for this purpose, the committee will meet not less than annually with the corporation's Chief Risk Officer and other management, and will also meet with one or more members of the Risk Policy Committee of the Board of Directors.

138.    Members of this Committee therefore bear a shared responsibility with Company executives for the skewed incentive compensation that played a significant role in distorting the CIO trading activities.

**Control, Access, and Authority**

139.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of JPMorgan, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by JPMorgan.

140.     Because of their advisory, executive, managerial, and directorial positions with JPMorgan, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of JPMorgan.

141.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of JPMorgan, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

142.     To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of JPMorgan were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 35 -

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)      remain informed as to how JPMorgan conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)      ensure that JPMorgan was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

143.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to JPMorgan and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of JPMorgan, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of JPMorgan, the absence of good faith on their part, and a reckless disregard for their duties to JPMorgan and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to JPMorgan.

144.    Defendant Dimon breached his fiduciary duties to investors by implementing and/or approving greater investment risks, by concealing and failing to timely disclose the risks and mounting losses, and by issuing false and misleading public announcements regarding both the risks and the losses.

145.     The Individual Defendants breached their fiduciary duties by approving the higher risk measures and by failing to timely disclose to investors both the higher risks and the mounting losses.

146.     The Individual Defendants each breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that JPMorgan had not taken on additional trading risk, and by failing to correct these statements after they were made.

147.     In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of federal securities laws.  As a result, JPMorgan has expended, and will continue to expend, significant sums of money to rectify the defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

148.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

149.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that JPMorgan's CIO was providing a conservative risk-management and risk-reduction function that was hedging the bank's other investment risks, when in fact the CIO had been converted into a proprietary trading desk that sought risky, short-term profits.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

- 37 -

150.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's investment risk profile.

151.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully and/or recklessly adopt inappropriately risky trading strategies in the guise of investment hedging, and further to make, release or condone improper statements regarding those strategies.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

152.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO JPMORGAN

153.    As a result of the Individual Defendants' wrongful conduct, JPMorgan adopted inappropriately risky trading strategies that resulted in at least a $6 billion loss, and likely greater. Individual Defendants further caused JPMorgan to disseminate false and misleading statements and to conceal the losses from investors, which resulted in increased damages to JPMorgan.  The losses and improper statements have devastated JPMorgan's credibility.  Additionally, JPMorgan is the

subject of a complex and expensive to defend securities fraud class action lawsuit. The Company will also face substantial costs in connection with the various regulatory investigations.

154.    As a direct and proximate result of the Individual Defendants' actions as alleged above, JPMorgan's market capitalization has been substantially damaged.

155.    Further, as a direct and proximate result of the Individual Defendants' conduct, JPMorgan has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending JPMorgan and certain officers in a SEC regulatory investigation, the securities class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy adverse criminal and/or civil judgments;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on JPMorgan's artificially-inflated stock price and inflated revenues; and

(c)    potentially increased borrowing costs resulting from downgrades to the Company's risk rating;

(d)    costs incurred from the loss of the Company's customers' confidence in JPMorgan's services.

156.    JPMorgan was further damaged by the precipitous decline in the Company's share price.

157.    Moreover, these actions have irreparably damaged JPMorgan's corporate image and goodwill. For at least the foreseeable future, JPMorgan will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

and have misled the investing public, such that JPMorgan's ability to raise equity capital or debt on favorable terms in the future is already impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158.    Plaintiff brings this action derivatively in the right and for the benefit of JPMorgan to redress injuries suffered, and to be suffered, by JPMorgan as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  JPMorgan is named as a nominal defendant solely in a derivative capacity.

159.    Plaintiff has been a shareholder of JPMorgan, continuously, from the time of the wrongdoing of which plaintiff complains until the present.  Plaintiff will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.

160.    At the time plaintiff commenced this action, the Board of JPMorgan consisted of the following individuals: Bell, Bowles, Burke, Cote, Crown, Dimon, Futter, Gray, Jackson, Novak, Raymond and Weldon.

161.    Accordingly, defendants make up a majority of the Board in place at the time of the filing of this Complaint.  Defendants participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them. Therefore, a majority of the Board is not disinterested and lacks sufficient independence to exercise business judgment as alleged herein.

162.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.  The wrongful acts described in this Complaint evidence a pattern of conduct showing the defendants' wholesale abandonment of their

fiduciary duties. Those acts include recklessly permitting the Company to engage in a litany of

misdeeds, including:

- Approving and/or condoning the plan to modify the CIO's purpose from Company-wide risk mitigation to a highly risky investment vehicle focused on short-term profits;

- Approving and/or condoning the modification of the VaR to hide the ever increasing risk to shareholders being perpetrated by the CIO's new and highly risky trading strategy;

- Approving materially false and misleading statements that failed to inform shareholders that defendants changed the CIO's purpose from risk-mitigation to a highly risky short-term profit vehicle for JPMorgan;

- Approving materially false and misleading statements that failed to inform shareholders that defendants modified the VaR to hide the substantial increases in risk (and commensurate potential for substantial losses) at the CIO; and

- Approving and/or condoning skewed incentive compensation that encouraged highly risky transactions by CIO traders and exposing the Company to large losses instead of hedging risk.

These acts, and the other improper acts and failures to act as set forth herein, demonstrate a

pattern of misconduct, which was not, nor could have been, the product of a valid or good faith

exercise of business judgment and demonstrate a pattern of misconduct.

163. Defendants knew, consciously disregarded and/or were reckless in not knowing

about: (i) the deleterious changes to the CIO's purpose and risk strategy; (ii) the changes in the VaR

that were designed to hide from shareholders the massive increase in risk (and commensurate

massive increase in potential losses) being taken on by the CIO's new role; (iii) the false and

misleading statements in JPMorgan filings with the SEC that failed to inform shareholders of the

changes to the CIO's trading practices and that the VaR had been modified to hide the increased risk

being taken on by the CIO; and (iv) refusing to take action against the other defendants for these

serious breaches of their fiduciary duties. The members of JPMorgan's Board have demonstrated

- 41 -

their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.   These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

164.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the JPMorgan Board to institute this action against the officers and members of the JPMorgan Board is excused as futile.   A pre-filing demand would be a useless and futile act because:

(a)    Each of the members of the JPMorgan Board signed one or more of JPMorgan's annual reports on Forms 10-K between 2010 and 2012 that misrepresented and/or omitted the fact that the CIO's mission was changed from one of hedging against risk to one of ever increasing risk taking in search of short term profits.   Moreover, each of these Forms 10-K misrepresented and/or omitted the fact that the VaR was being modified to hide the increasingly risky investment exposure created by the CIO.

(b)    Defendant Dimon faces a substantial likelihood of liability for his individual misconduct.   He is a named defendant in a federal class action in the Southern District of New York alleging that he personally violated §10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved false statements.   If defendant Dimon vigorously pursued these derivative claims, that would entail an investigation of his own conduct regarding the allegations herein.   This, in turn, would demonstrate defendant Dimon's personal liability for breaching his fiduciary duties and/or for violating §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.   As such, defendant

- 42 -

Dimon is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims. Thus, demand is futile as to defendant Dimon.

(c)     Additionally, defendant Dimon cannot render an independent decision because he is and was a high-ranking officer of JPMorgan during the time period when the wrongdoing occurred. Defendant Dimon serves as both the CEO and as a director of JPMorgan's Board, did so throughout the Relevant Period, and instigated and oversaw the Company's radical shift in investment risk policy. Moreover, according to relevant portions of the Company's 2011 proxy statement, defendant Dimon is not an independent director. Defendant Dimon is a current Company insider and therefore cannot independently consider a demand.

(d)     Defendant Dimon is not disinterested because he was at the center of the entire scheme to hide the trading losses at the CIO. As detailed herein, defendant Dimon was directly responsible for the alteration of the CIO's principal function from a conservative hedge against risk to a highly risky venture that took on ever increasing levels of risk. Moreover, defendant Dimon was also directly involved in the decision to modify the VaR in order to hide the riskier trading positions being undertaken by the CIO. Rather than informing shareholders of the Company's true risk exposure created by the changes at the CIO, defendant Dimon misled investors. For example, defendant Dimon signed all of the Company's financial reports filed with the SEC, each of which failed to inform shareholders of the new and much riskier investment strategies being employed by the CIO or that the VaR was being manipulated to hide the increased risk from shareholders. Additionally, as noted herein, defendant Dimon issued many of the false and misleading statements, through mechanisms other than regulatory filings, to shareholders. Thus, defendant Dimon faces a substantial likelihood of liability for breaching his fiduciary duties to the Company and shareholders – rendering any demand upon him excused as a futile effort.

797585_1

(e)     Defendants Bell, Bowles, Gray, and Jackson, as members of the Audit Committee, also breached their duties of loyalty and good faith and grossly mismanaged JPMorgan's affairs.  Under the Audit Committee charter they were responsible for, among other things: (a) receiving periodic presentations from management and the independent registered public accounting firm regarding "significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data"; (b) "Review and discuss, at least quarterly, with management, the independent registered public accounting firm and the General Auditor the annual audited financial statements and quarterly financial statements, including reviewing the corporation's specific disclosures made in 'Management's Discussion and Analysis of Financial Condition and Results of Operation'"; and (c) "Taking into consideration the Board's allocation of responsibility for review of credit risk, market risk and fiduciary risk to the Board's Risk Policy Committee, discuss with management guidelines and policies for assessing and managing the corporation's exposure to risks, including reputation risk, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures."

(f)     Despite their duties and qualifications, especially related to the Company's exposure to risks, defendants Bell, Bowles, Gray, and Jackson knowingly or recklessly reviewed and approved false financial statements that failed to inform shareholders that the CIO's mission had changed to take on riskier and riskier trades in pursuit of short term profits and that the VaR was being manipulated to hide the massive additional risk exposure created by the CIO's new mission. The deleterious effect these changes had on JPMorgan were omitted from each and all of the false and misleading financial statements and were only revealed to shareholders after the CIO's trading losses became too large to hide.  Indeed, defendants admitted that the financial statements signed by

- 44 -

defendants Bell, Bowles, Gray and Jackson were materially false and misleading when they were forced to restate JPMorgan's earnings in 2012 to reflect the CIO's multi-billion dollar losses.

(g)     Furthermore, despite their obligations detailed above, the Audit Committee members were fully briefed as to the extent and risk exposure of the CIO's risky positions no later than April 5, 2012 but failed to take any action in response to the aforementioned briefing.  In fact, despite knowing about the extent of the CIO's risk exposure, the Audit Committee members knowingly and/or recklessly allowed the Company to continue issuing materially false and misleading public statement and SEC filings, including statements in the first-quarter earnings call on April 13, 2012.

(h)     Thus, demand upon defendants Bell, Bowles, Gray, and Jackson is excused as futile because they each face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and grossly mismanaging JPMorgan's affairs.

(i)     Defendants Cote, Crown, and Futter, as members of the Risk Policy Committee, also breached their duties of loyalty and good faith and grossly mismanaged JPMorgan's affairs.  Under the Risk Policy Committee charter, these defendants were, among other things, responsible for, "oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk."  The Risk Policy Committee charter explains that the Committee's duties include, among other things: (a) "review with management guidelines and policies to govern the process for assessing and managing such risks"; (b) "review benchmarks for and major financial risk exposures from such risks"; (c) "receive and review reports from management of the steps it has taken to monitor and control such exposures"; (d) "review management's performance against these policies and benchmarks"; (e) "receive and review reports on selected risk topics as management or the

Committee deems appropriate from time to time"; (f) "meet not less than semi-annually with the Audit Committee on topics of common interest"; and (g) "approve and periodically review the corporation's Risk Appetite Policy, and review actual or forecast results exceeding risk appetite tolerances."

      (j)      Despite their duties and qualifications, especially related to the Company's exposure to risks, defendants Cote, Crown, and Futter knowingly or recklessly reviewed and approved false financial statements that failed to inform shareholders that the CIO's mission had changed to take on riskier and riskier trades in pursuit of short term profits and that the VaR was being manipulated to hide the massive new risk exposure created by the CIO's new mission. The deleterious effect these changes had on JPMorgan were omitted from each and all of the false and misleading financial statements and were only revealed to shareholders after the CIO's trading losses became too large to hide. Indeed, defendants admitted that the financial statements signed by defendants Cote, Crown, and Futter were materially false and misleading when they were forced to restate JPMorgan's earnings in 2012 to reflect the CIO's multi-billion dollar losses.

      (k)      Furthermore, despite the duties and obligations listed above, the Risk Policy Committee members were fully briefed as to the extent and risk exposure of the CIO's risky positions no later than April 5, 2012 but failed to take any action in response to the aforementioned briefing. In fact, despite knowing about the extent of the CIO's risk exposure, the Risk Policy Committee members knowingly and/or recklessly allowed the Company to continue issuing materially false and misleading public statement and SEC filings, including statements in the first-quarter earnings call on April 13, 2012.

797585_1

(l)      Thus, demand upon defendants Cote, Crown, and Futter is excused as futile because they each face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and grossly mismanaging JPMorgan's affairs.

(m)      Defendants Burke, Novak, Raymond, and Weldon, also breached their duties of loyalty and good faith and grossly mismanaged JPMorgan's affairs as members of the Compensation & Management Development Committee.  Under the Compensation & Management Development Committee charter, defendants Burke, Novak, Raymond, and Weldon were responsible for reviewing "the corporation's compensation practices and the relationship among risk, risk management and compensation in light of the corporation's objectives, including its safety and soundness and the avoidance of practices that would encourage excessive risk."

(n)      Despite their duties and qualifications, especially related to the Company's exposure to "practices that would encourage excessive risk," defendants Burke, Novak, Raymond, and Weldon knowingly or recklessly reviewed and approved false financial statements that failed to inform shareholders that the CIO's mission had changed to take on riskier and riskier trades in pursuit of short term profits and that the VaR was being manipulated to hide the massive new risk exposure created by the CIO's new mission.  The deleterious effect these changes had on JPMorgan were omitted from each and all of the false and misleading financial statements and were only revealed to shareholders after the CIO's trading losses became too large to hide.  Indeed, defendants admitted that the financial statements signed by defendants Burke, Novak, Raymond, and Weldon were materially false and misleading when they were forced to restate JPMorgan's earnings in 2012 to reflect the CIO's multi-billion dollar losses.

(o)      Additionally, the members of the Compensation & Management Development Committee were responsible for approving the skewed compensation policy for CIO employees that

- 47 -

encouraged and incentivized traders to expose the Company to ever higher risks.  Indeed, this incentive compensation played a significant role in distorting the CIO trading activities that exposed JPMorgan to massive multi-billion dollar losses and ultimately led to the Company's 2012 restatement of its financial results.

(p)     Furthermore, despite the duties and obligations listed above, the Compensation & Management Development Committee members were fully briefed as to the extent and risk exposure of the CIO's risky positions no later than April 5, 2012 but failed to take any action in response to the aforementioned briefing.  In fact, despite knowing about the extent of the CIO's risk exposure, the Compensation & Management Development Committee members knowingly and/or recklessly allowed the Company to continue issuing materially false and misleading public statements and SEC filings, including statements in the first-quarter earnings call on April 13, 2012.

(q)     Thus, demand upon defendants Burke, Novak, Raymond, and Weldon is excused as futile because they each face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and grossly mismanaging JPMorgan's affairs.

(r)     The JPMorgan Board and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from JPMorgan's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the defendants knew the adverse non-public information regarding the new and much riskier trading strategies and financial reporting.  Pursuant to their specific duties as Board members,

- 48 -

defendants are charged with managing the Company and conducting its business affairs.  Defendants breached the fiduciary duties that they owed to JPMorgan and its shareholders in that they failed to prevent and correct the much riskier trading strategies and financial reporting and hid these strategies from shareholders by issuing false and misleading statements that omitted these now changed investment strategies on modifications to the VaR.  Thus, the JPMorgan Board cannot exercise independent, objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

(s)     The acts complained of constitute violations of the fiduciary duties owed by JPMorgan's officers and directors and these acts are incapable of ratification.

(t)     The members of JPMorgan's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(u)     The members of JPMorgan's Board are well-compensated for their Board service.  The Company's most recent proxy statement, filed with the SEC on April 4, 2012, revealed that the Board earned the following in 2011:

### 2011 Director compensation table

| Director | Fees earned or paid in cash ($) | 2011 Stock award ($) | Total ($) |
|---|---|---|---|
| James A. Bell | $        14,167 | $              - | $       14,167 |
| Crandall C. Bowles | 88,750 | 170,000 | 258,750 |
| Stephen B. Burke | 75,000 | 170,000 | 245,000 |
| David M. Cote | 75,000 | 170,000 | 245,000 |
| James S. Crown | 130,000 | 170,000 | 300,000 |
| Ellen V. Futter | 75,000 | 170,000 | 245,000 |
| William H. Gray, III | 96,250 | 170,000 | 266,250 |
| Laban P. Jackson, Jr. | 252,500 | 170,000 | 422,500 |
| David C. Novak | 90,000 | 170,000 | 260,000 |

| | | | |
|---|---|---|---|
| Lee R. Raymond | 90,000 | 170,000 | 260,000 |
| William C. Weldon | 75,000 | 170,000 | 245,000 |

All of the Director Defendants received millions in compensation from JPMorgan during their tenure on the Board.[2]  Filing a derivative action would put defendants' continued receipt of these lucrative fees in jeopardy.  For this reason, defendants are incapable of exercising independent objective business judgment in deciding whether to bring this action.

> (v)      Based on the particularized facts above, to properly prosecute this lawsuit, JPMorgan's directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in civil liability and/or sanctions.  This they will not do.

> (w)      If JPMorgan's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Complaint by Director and Officer ("D&O") Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by JPMorgan against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of JPMorgan, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

---

[2]      Defendant Bell joined the JPMorgan Board in November 2011 and has only received approximately $14,167 in compensation thus far.

797585_1

coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

(x)     JPMorgan has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

(y)     Plaintiff therefore brings this derivative action to: (i) recover damages against JPMorgan's officers and directors for the benefit of the Company, and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect JPMorgan and its shareholders from a repeat of the damaging events described above.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    The Individual Defendants owed and owe JPMorgan fiduciary obligations.  By reason of their fiduciary relationships, Individual Defendants owed and owe JPMorgan the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

167.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

168.     The Individual Defendants each knowingly and/or recklessly implemented or approved the implementation of trading strategies that exposed the Company to increased trading risk, and further approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, JPMorgan has sustained significant damages.  As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

170.     Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

171.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, JPMorgan.

173.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to JPMorgan.

174.     Plaintiff, as a shareholder and representative of JPMorgan, seeks restitution from these Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

175.     Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Aiding and Abetting Breaches of Fiduciary Duty**

176.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.     Individual Defendants engaged in conduct in breach of their fiduciary duties of good faith, honesty and loyalty owed to JPMorgan.

178.     Individual Defendants abused the control reposited in them by virtue of their high-level positions in the Company and were aided and abetted by each other.

179.     By reason of the foregoing conduct, Individual Defendants have damaged JPMorgan.

180.     Plaintiff, as a shareholder of JPMorgan, seeks damages and other relief for JPMorgan.

181.     Plaintiff, on behalf of JPMorgan, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.     Directing JPMorgan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect JPMorgan and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- 53 -

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to provide for immediate management notice and corrective action in the event that any trading or other activities expose the Company to unacceptable exposure or risk levels;

- a provision to permit the shareholders of JPMorgan to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of JPMorgan's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions.

C.      Awarding to JPMorgan restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses to the extent provided by law; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

797585_1

DATED:  December 17, 2012        Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK S. REICH

_____
             DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III
ERIK W. LUEDEKE
BENNY C. GOODMAN III
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON
250 West 57th Street, Suite 1316
New York, NY 10107
Telephone:  (212) 810-2430
Facsimile:  (212) 810-2427

- 55 -

KENDALL LAW GROUP, LLP
JOE KENDALL
JAMIE J. McKEY
3232 McKinney, Ste 700
Dallas, Texas 75204
Telephone: 214-744-3000
Facsimile: 214-744-3015

Attorneys for Plaintiff

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West A Street, Suite 750
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

Lead Counsel for Plaintiffs

**VERIFICATION**

I, Gerard Grysko, on behalf of the Wayne County Employees' Retirement System, hereby verify that I am familiar with the allegations in the Amended Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment, and that I have authorized the filing of the Amended Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 17th day of December, 2012.

WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM

By: _____

GERARD GRYSKO

### CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on December 17, 2012, I caused a true and correct copy of the attached:

> Amended Verified Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment

to be: (i) filed by hand with the Clerk of the Court of the Southern District of New York; and (ii) served by U.S. mail to all counsel listed on the attached service list.

Kelly Stadelmann

JP MORGAN DERIVATIVE 12

Service List - 12/17/2012  (12-0152)

Page 1 of 1

**Counsel For Defendant(s)**

Jonathan C. Dickey
Adam H. Offenhartz
Brian M. Lutz
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY  10166-0193
   212/351-4000
   212/351-4035 (Fax)

Daryl A. Libow
Christopher Michael Viapiano
Sullivan & Cromwell LLP
1701 Pennsylvania Ave., N.W., Suite 800
Washington, DC  20006-5805
   202/956-7500
   202/293-6330 (Fax)

Richard C. Pepperman II
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
   212/558-4000
   212/558-3588 (Fax)

**Counsel For Plaintiff(s)**

Frank J. Johnson
David Elliot
Johnson & Weaver, LLP
110 West "A" Street, Suite 750
San Diego, CA  92101
   619/230-0063
   619/255-1856 (Fax)

Benny C. Goodman III
Erik W. Luedeke
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Thomas G. Amon
Robbins Umeda LLP
600 B Street, Suite 1900
San Diego, CA  92101
   619/525-3990
   619/525-3991 (Fax)