UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| In re JPMORGAN CHASE & CO. DERIVATIVE LITIGATION | MEMORANDUM DECISION AND ORDER<br><br>12 Civ. 03878 (GBD)<br>(Derivative Action) |

GEORGE B. DANIELS, United States District Judge:

Plaintiff Wayne County Employees' Retirement System's ("Plaintiff"), without having made a demand on the Board to bring this lawsuit, seeks to bring this derivative action on behalf of JPMorgan Chase & Co. ("JPMorgan" or the "Company"), against defendants James A. Bell, Crandall C. Bowles, Stephen B. Burke, David M. Cote, James S. Crown, Ellen V. Futter, William H. Gray, III[1], Laban P. Jackson, Jr., David C. Novak, Lee R. Raymond and William C. Weldon ("Director Defendants"), as well as defendants James S. Dimon, Douglas L. Braunstein, John Hogan, Barry Zubrow and Ina Drew ("Officer Defendants"), collectively, the "Individual Defendants," and nominal defendant JPMorgan. Plaintiff asserts that certain JPMorgan directors and officers breached their fiduciary duties by (i) allegedly approving or condoning changes in the purpose of JPMorgan's Chief Investment Office ("CIO") "from company-wide risk mitigation to a highly risky proprietary trading desk focused on short-term profits" and (ii) approving "false and misleading statements and/or omissions" that failed to inform shareholders of these alleged changes and the resulting "high risk of loss." (See Compl. ¶ 305.) The Complaint asserts four causes of action against the Individual Defendants: (i) breach of fiduciary

---

[1] Defendant William H. Gray, III, was dismissed from the lawsuit by stipulation on September 4, 2013. ECF No. 40.

1

duty, (ii) unjust enrichment, (iii) aiding and abetting breaches of fiduciary duty, and (iv) waste of corporate assets. (Compl. ¶¶ 387, 391, 396, 401.)[2]

Defendants move pursuant to Federal Rule of Civil Procedure 23.1 and Delaware Court of Chancery Rule 23.1 to dismiss the Second Amended Complaint. Docket No. 35. Defendants' motion to dismiss is GRANTED.[3]

## Background[4]

### I. The Parties

JPMorgan is a financial holding company incorporated in Delaware. (Compl. ¶¶ 23, 75.) Plaintiff is a JPMorgan shareholder. (Id. ¶ 22.) The Director Defendants are nine current and two former outside (or non-management) directors of JPMorgan. (Id. ¶¶ 25-46.) Dimon, JPMorgan's Chairman and CEO, is the only JPMorgan officer who serves on the Board. (Id. ¶ 24.) The other Officer Defendants are a Vice Chairman of JPMorgan and former CFO (Braunstein), former Chief Risk Officers (Hogan and Zubrow) and former Chief Investment Officer (Drew). (Id. ¶¶ 47-50.)

### II. The Complaint

As a basis for its claims, Plaintiff alleges that the Individual Defendants "misle[d] shareholders into believing that JPMorgan's CIO was providing a conservative risk-management and risk-reduction function that was hedging the Company's other investment risks, when in fact the CIO had been

---

[2] Plaintiff's unjust enrichment, aiding and abetting, and corporate waste claims are inexorably linked to its breach of fiduciary duty claim. Plaintiff argues only that in breaching their fiduciary duties the Individual Defendants were aided and abetted by each other, that they committed corporate waste in compensating those who were breaching their fiduciary duties, and that the recipients of that compensation were unjustly enriched by receiving payment while breaching their duties. (Compl. ¶¶ 389-402). As noted infra, Plaintiffs have failed to sufficiently allege that demand of the Board would have been futile. Accordingly, Plaintiff cannot maintain any of its additional claims. See In re Bank of New York Mellon Corp. Forex Transactions Litig., 2013 WL 3358028 at *4 (S.D.N.Y. July 2, 2013).

[3] Three shareholder derivative actions were filed in this Court, two of which were consolidated into this action. See Baker v. Dimon, No. 12-3878 (S.D.N.Y. May 15, 2012); Wayne Cnty. Emps. Ret. Sys. v. Dimon, No. 12-7313 (S.D.N.Y. Sept. 28, 2012). The Baker plaintiff is no longer a JPMorgan shareholder and thus withdrew, leaving only one plaintiff in this action. The third case, in which the plaintiff made a pre-suit demand upon the Board, was dismissed on the basis that the allegations in the Complaint were insufficient to overcome the presumption of the business judgment rule. See Espinoza v. Dimon, No. 13-2358 (S.D.N.Y. Apr. 9, 2013) at ECF No. 36. Thus, even where the Plaintiff made a demand upon the Board, the business judgment rule was a basis for dismissal of the Plaintiff's case. Id.

[4] The following factual allegations are taken from the Complaint (or documents attached to it or incorporated by reference) and are deemed to be true for the purposes of a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

2

converted into a proprietary trading desk that sought risky, short-term profits." (Id. ¶ 71.) According to the Complaint, "CIO had become massively risky and out of control by late 2011 and early 2012." (Id. ¶ 4.) Plaintiff argues that the Board "implemented or approved the implementation of trading strategies that exposed the Company to increased trading risk" and "approved the issuance of false statements that misrepresented and failed to disclose material information." (Id. ¶ 385.) In May 2012, JPMorgan disclosed that CIO's synthetic credit portfolio had sustained mark-to-market losses of approximately $2 billion, that later increased to more than $6 billion. (Id. ¶ 15.)

## Standard of Review

Plaintiff argues that a demand on the Board would have been futile because the Director Defendants each face a substantial likelihood of liability for breaching their fiduciary duty of loyalty based on a conscious failure to respond to increasing risk at the CIO and for failing to monitor the CIO's operations. Further, Plaintiff argues that demand should be excused on the basis that the Director Defendants committed acts and omissions not in good faith by deliberately dodging regulatory oversight and knowingly misleading shareholders. (See Opp'n at 7, 22). Plaintiff has failed to allege sufficient facts to create a reasonable doubt as to whether the Director Defendants could have properly exercised their independent and disinterested business judgment in responding to a demand. Id., see also Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993).

Derivative lawsuits must meet "a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." Fink v. Weill, 2005 U.S. Dist. LEXIS 20659, at *9 (S.D.N.Y. 2005), citing Fed. R. Civ. P. 23.1. Though a complaint may plead a "conceivable" allegation that would survive a motion to dismiss under Rule 12(b)(6), "vague allegations are ... insufficient to withstand a motion to dismiss pursuant to Rule 23.1." McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008). "Allegations of demand futility under Rule 23.1 must comply with stringent requirements of factual particularity that differ substantially from the permissive

notice pleadings governed solely by Chancery Rule 8(a)." Stone, 911 A.2d at 367 n.9. In such cases, "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1.[5]

Although Fed. R. Civ. P. 23.1 outlines the procedural rules with which a derivative action in federal court must comply, state law provides the substantive law governing a Board's refusal of a demand. See Levner, 903 F. Supp. at 452, citing RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991); see also Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 108-09 (1991); Halpert Enters, Inc. v. Harrison, 362 F. Supp. 2d 426, 430 (S.D.N.Y. 2005). As the parties agree, because JPMorgan is a Delaware corporation, the sufficiency of the Derivative Plaintiff's demand futility allegations is analyzed under Delaware law. See Opp'n at 5, see also Defs' Mem. at 14; Halpert Enters., Inc. v. Harrison, 2008 WL 4585466 (2d Cir. Oct. 15, 2008).

## Demand Futility

Under Delaware law, the demand requirement is a "substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." Braddock v. Zimmerman, 906 A.2d 776, 784 (Del. 2006) (internal quotation marks omitted). Pursuant to Delaware law, a plaintiff in a shareholder derivative action must allege either: (1) that he has made a demand upon the corporation's board of directors to take the requested action; or (2) the reasons why such a demand upon the board would be futile. See Rales, 634 A.2d at 930; Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). If, as here, a shareholder does not first demand that the directors pursue the

---

[5] Chancery Rule 23.1 is "either identical to or consistent with the principles behind Federal R. Civ. P. 23.1." Levner v. Prince Alwaleed Bin Talal Bin Abdulaziz Al Saud, 903 F. Supp. 452, 456 n. 4 (S.D.N.Y. 1994). See also Allison on Behalf of G.M.C. v. General Motors Corp., 604 F. Supp. 1106, 1116 n. 11 (D. Del. 1985) ("In practical terms, it is important that the result of applying Chancery Rule 23.1 is the same as the application of Fed. R. Civ. P. 23.1. It would be disquieting if a derivative plaintiff suing a Delaware corporation could achieve a different answer as to whether demand is excused as futile simply by filing, quite literally, 'across the street' in Chancery Court."), aff'd, 782 F.2d 1026 (3d Cir. 1985). Accordingly, cases interpreting both standards are equally applicable to the instant question.

alleged cause of action, he must establish that demand is excused by satisfying "stringent [pleading] requirements of factual particularity" by "set [ting] forth particularized factual statements that are essential to the claim" in order to demonstrate that making demand would be futile. Citigroup, 964 A.2d at 120–21 (internal quotations omitted). In order to sufficiently allege that a demand upon the board would have been futile, a plaintiff must present particularized facts showing that the board is "incapable of exercising its power and authority to pursue derivative claims directly." White v. Pan ic, 783 A.2d 543, 551 (Del. 2001). The plaintiff may not rely on mere conclusory allegations, In re INFOUSA Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007), and the pleading burden imposed by Rule 23.1 is a high hurdle for plaintiffs to clear. See McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008). Delaware law provides two principal tests for demand futility.

First, when a claim involves "a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," then under the Aronson test, a plaintiff must allege "particularized facts creating a reason to doubt that (1) the directors are disinterested and independent or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Wood v. Baum, 953 A.2d 136, 140 (Del. 2008) (footnotes and internal quotation marks omitted). Under the business judgment rule, courts presume "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." Aronson, 473 A.2d at 812, overruled on other grounds by Brehm, 746 A.2d 244; see also Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A., 34 A.3d 1074, 1082 (Del. 2011) ("The entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability.") (internal quotation marks and alterations omitted). The rule protects the actions of disinterested directors who inform themselves of all material information reasonably

available to them prior to making the decision and then do not act with gross negligence. See Aronson, 473 A.2d at 812.

Second, when the suit involves "not a business decision of the Board but rather a violation of the Board's oversight duties," then the Rales test "requires that the plaintiff allege particularized facts establishing a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Wood, 953 A.2d at 140 (footnotes and internal quotation marks omitted). A key inquiry "is whether the plaintiffs have pled facts that show that [the] directors face a sufficiently substantial threat of personal liability" to render them "interested" for purposes of considering demand. Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003).

Plaintiff advances three theories for excusing demand with regard to its breach of fiduciary duty claims. First, Plaintiff asserts that the Director Defendants could not consider a demand impartially because they face a substantial threat of personal liability for their "conscious decisions to allow the CIO's high-risk proprietary trading to continue" until it resulted in a $6.2 billion loss. (Opp'n at 7-16.) Second, Plaintiff contends that demand is excused because the Director Defendants committed acts and omissions not in good faith – by deliberately dodging regulatory oversight and knowingly making or failing to correct false and misleading statements made in Company financials. (See id. at 22-29.) Finally, Plaintiff argues that demand is excused because a majority of the Board is not independent. (Id. at 33-35.)

I. **Conscious Disregard of Risk**

Defendants first argues that Plaintiff has failed to adequately allege that a majority of the Board faces a substantial likelihood of liability for failing to monitor the risks of CIO's activities. Plaintiff's principal claim is based on the Board's purported "conscious decision[] to allow the CIO's high-risk" activities "to continue unchecked." (Opp'n at 7; see also Opp'n at 9-21.) Plaintiff alleges that

"[b]eginning in 2007 and continuing through early 2012 – a period of approximately five years – the Board knew or consciously disregarded the exponential increase in risk being accumulated by the CIO." (Opp'n at 7.) Plaintiff's claim implicates the Caremark theory of liability. See Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996). As the Court of Chancery has since recognized, "[t]he essence of a Caremark claim is a breach of the duty of loyalty arising from a director's bad-faith failure to exercise oversight over the company." Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong, 66 A.3d 963, 980–82 (Del. Ch. 2013). Bad faith "in the corporate fiduciary duty of loyalty context [includes] (among other things) a failure to act in the face of a known duty to act, which demonstrates a conscious disregard of one's duties." Gatz Properties, LLC v. Auriga Capital Corp., 59 A.3d 1206, 1216–17 (Del. 2012) (quotation marks omitted). A plaintiff can thus show bad faith by "properly alleging particularized facts that show that a director consciously disregarded an obligation to be reasonably informed about the business and its risks or consciously disregarded the duty to monitor and oversee the business." In re Citigroup Inc. S'holder Deriv. Litig., 964 A.2d 106, 125 (Del. Ch. 2009).

Because Plaintiff's claim is premised on an alleged failure to monitor *business risks* their burden is even greater. See In re Goldman Sachs Grp., Inc. S'holder Litig., 2011 WL 4826104, at *22 (Del. Ch. Oct. 12, 2011) (noting that such a claim was only a "theoretical possibility"). To sustain its claim, Plaintiff "would essentially have to show that the board...*consciously* disregarded red flags signaling that the company's employees were taking facially improper...business risks," In re Goldman Sachs Grp., Inc. S'holder Litig., 2011 WL 4826104, at *22 n.217 (Del. Ch. Oct. 12, 2011) (emphasis in original), or "allege[] particularized facts showing that the directors consciously acted in bad faith by failing to take action despite actual or constructive knowledge of illegal activity." In re SAIC Inc. Deriv. Litig., 2013 WL 2466796 (S.D.N.Y. June 10, 2013). Plaintiff has failed to do either. See, e.g., In re Forest Laboratories, Inc. Derivative Litig., 450 F. Supp. 2d 379, 390 (S.D.N.Y.2006)

7

("The Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge of the Danish Study or any other alleged inside information.").

Plaintiff has not adequately pled sufficient facts to support its assertion that the Board consciously disregarded red flags regarding risk in CIO. Plaintiff argues that "the Director Defendants failed to respond in any way as they received information that the CIO's Synthetic Credit Portfolio (the "SCP") was exponentially increasing in risk in violation of JPMorgan's internal risk limits." (Opp'n at 9.). In contending that a majority of the Board ignored warnings of growing risk in CIO, Plaintiff points to information that went either to a small subset of JPMorgan's directors or to none at all. Plaintiff emphasizes that JPMorgan exceeded its firm-wide VaR limit in January (Opp'n at 16), but the Complaint alleges that this information was reported only to one director: JPMorgan's CEO Dimon. (See Compl. ¶ 152.) Similarly, Plaintiff asserts that the entire Board knew that CIO's SCP routinely exceeded risk limits, yet the cited paragraph of the Complaint alleges only that the Board Risk Policy Committee (three independent directors) learned that CIO had breached stress limits on a few occasions in early 2011. (See Opp'n at 16 (citing Compl. ¶ 206(d)(ii)). Plaintiff also points to CIO's limit excessions in early 2012 (id. at 7-8, 10, 17), but cites no factual allegations showing that any member of the Board other than Dimon was informed of those excessions.

Plaintiff cannot satisfy its burden of pleading that a majority of the Board faces a substantial likelihood of personal liability by relying on allegations that a minority of the Board (i.e. JPMorgan's CEO Dimon, the one executive on the Board) was aware of certain information. (See, e.g., Opp'n at 15). Delaware law is clear that "the wholesale imputation of one director's knowledge to every other for demand excusal purposes" is impermissible. Desimone v. Barrows, 924 A.2d 908, 943 (Del. Ch. 2007). Plaintiff also repeatedly asserts that it is "implausible" to infer that JPMorgan's directors were unaware of certain alleged red flags regarding risk in CIO. (Opp'n at 10, 14-15). Plaintiff's

8

conclusory allegations are insufficient. See Guttman, 823 A.2d at 499 (courts should not "accept cursory contentions of wrongdoing as a substitute for the pleading of particularized facts.").

Plaintiff's remaining allegations pertain to only two pieces of purportedly relevant information that allegedly reached a majority of the Board – a 2007 audit report describing certain CIO trading activities as "proprietary position strategies" and a summary of a 2010 letter from the OCC. (See Opp'n at 11-14.) Plaintiffs cannot elevate the 2007 audit report into a "red flag" that CIO was taking facially improper business risks simply because the report noted that CIO included "proprietary position strategies..." (Opp'n at 11.) Even the OCC letter, which Plaintiff concedes was provided to the Board in a summary form, said only that CIO needed to better "'document investment policies and portfolio decisions'" within two portfolios that lacked "'a documented methodology'" and "'clear records of decisions.'" (Permanent Subcommittee on Investigations Report at 223.) These allegations did not put the Board on notice of facially improper business risks or illegal activity pertaining to JPMorgan's CIO. See Citigroup, 964 A.2d at 131 ("oversight duties under Delaware law are not designed to subject directors, even expert directors, to *personal liability* for failure to predict the future and to properly evaluate business risk"); cf. In re ITT Corp. Deriv. Litig., 588 F. Supp. 2d 502, 514 (S.D.N.Y. 2008) (even "violations of law . . . [that] caused massive damage" did "not establish a sustained and systematic failure of oversight").[6]

## II. Knowing Engagement in Fraudulent or Illegal Conduct

Plaintiff further contends that a majority of the Board faces a substantial likelihood of personal liability based on the directors' own supposed misconduct. Plaintiff argues that the directors: (i) approved of CIO's change in purpose from Company-wide risk mitigation to a highly risky proprietary

---

[6] Plaintiff's allegations do not come close to pleading a "sustained or systematic failure" of oversight by the Board required to state a Caremark claim. Caremark, 698 A.2d at 971. In the rare cases in which courts have held that plaintiffs adequately alleged that directors faced a substantial likelihood of personal liability based on a Caremark claim, there were allegations of repeated violations of the law and an "extensive paper trail . . . concerning the violations" that led directly to the Board. In re Abbott Labs. Deriv. S'holders Litig., 325 F.3d 795, 806-09 (7th Cir. 2003) (board failed to correct "six years of noncompliance" with federal law despite repeated warnings from FDA, entry into "Voluntary Compliance Plan" with FDA and notice of violations in press). Plaintiff has made no such allegations here.

trading desk focused on short-terms profits and of the modification of JPMorgan's risk models; (ii) deliberately hid CIO's trading, risk exposure and losses from the OCC; and (iii) made false or misleading statements in violation of the securities laws. (Compl. ¶ 305; Opp'n at 22-29.)

With respect to Plaintiff's allegations that the Director Defendants knowingly approved of an illegal change in purpose and modification of risk models, the Complaint lacks particularized allegations that a majority of the Director Defendants knew of (much less approved) the trades by the CIO personnel in London that ultimately resulted in the large losses in 2012. Plaintiff alleges only that JPMorgan's Chairman and CEO (Dimon) and the three directors on the Risk Policy Committee (Cote, Crown and Futter) received certain reports and presentations about CIO's positions in credit derivatives before rumors of those positions became public in early April 2012. (See, e.g., Compl. ¶¶ 152, 154, 157, 198, 206, 209, 344, 347-51.) Nothing in the Complaint (or in the PSI Report upon which it relies) even suggests that Dimon or the members of the Risk Policy Committee were provided before April 2012 with any specific information about the CIO trading strategy that led to large losses in 2012. The Complaint thus does not include particularized factual allegations demonstrating that those four directors "knowingly engaged in 'fraudulent' or 'illegal' conduct" or otherwise acted in bad faith, as is necessary to plead that they are interested. Wood, 953 A.2d at 141-42 & n.16.

In addition, Plaintiff does not allege that JPMorgan's other seven directors received any reports and presentations about CIO's positions, but rather seeks to impute the supposed knowledge of Dimon and the three directors on the Risk Policy Committee to every other director through general references to "the Director Defendants" and "the Board." (See Compl. ¶¶ 206, 209.) Delaware law is clear, however, that "the wholesale imputation of one director's knowledge to every other for demand excusal purposes" is impermissible. Desimone, 924 A.2d at 943; see also Rahbari, 732 F. Supp. 2d at 386 n.21 (declining to impute knowledge of audit committee to entire board).

Plaintiff also points to two supposed deliberate efforts to "dodge" regulatory oversight: (i) JPMorgan's response to the 2010 OCC letter, and (ii) JPMorgan's communications with the OCC in April 2012 after initial reports of the SCP's large positions became public. With respect to the first instance, Plaintiff concedes that the Board relied on management to respond to the concerns raised by the OCC 2010 letter, (Opp'n at 24), yet asserts that it was somehow improper for the Board to delegate "authority over addressing the OCC's concerns" to CIO management. (Opp'n at 24.). Plaintiff's claim is at odds with Delaware law, which "expressly permits a board of directors to delegate managerial duties to officers of the corporation" unless prohibited by charter or bylaw. In re Walt Disney Co. Deriv. Litig., 907 A.2d 693, 762 n.490 (Del. Ch. 2005) (internal quotation marks omitted). Plaintiff makes no allegation of such a prohibition here. Plaintiff's additional assertion that the "Director Defendants refused multiple OCC requests to supply…information" between early April and May 4, 2012, is unsupported by any specific factual allegations in the Complaint.

Plaintiff also contends that demand is excused because "the Director Defendants face a substantial likelihood of liability" for securities fraud because they "approved materially false and misleading [SEC] statements that misled shareholders about JPMorgan's risk exposure and mounting losses from the CIO's SCP." (Opp'n at 27.) However, the only statements even remotely connected to the Director Defendants are those contained in the Company's financial statements or earnings press releases that they approved. (See Compl. ¶¶ 202-10.) But, even as to these statements, the Complaint does not "allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions." In re Bank of New York Mellon Corp. Forex Transactions Litig., 2013 WL 3358028 at *4 (S.D.N.Y. July 2, 2013). Rather, the Complaint alleges only that the financial statements were materially false and that the Directors "issued, approved, and/or failed to correct the filings." (Compl. ¶ 102.) "Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient[ly]

11

particularized pleading to excuse demand under Rule 23.1." Citigroup, 964 A.2d at 133 n.188; see also Wood, 953 A.2d at 142 (suggesting that there is no substantial threat of personal liability when, *inter alia*, the complaint is "devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements") (internal quotation marks omitted).[7]

### III. Disinterested or Independent Directors

Plaintiff argues that "a majority of the Director Defendants face disabling personal conflicts of interest." (Opp'n at 33-34 & n.30.) However, Plaintiff's opposition specifically addresses the purported conflicts of only two Board members (Dimon and Futter), (id.), and fails to allege particularized facts raising a reasonable doubt that a majority of JPMorgan's directors were disinterested or independent at the time the Complaint was filed. See Aronson, 473 A.2d at 814-15 & n.8. Having failed to allege that a majority of the Board lacked independence, Plaintiff states that "a majority of the Director Defendants had extensive personal loans/extensions of credit, interlocking directorates, and other conflicted relationships." Id. at 34. Plaintiff's conclusory assertion does not provide the necessary "particularized facts about the materiality of the relationship[s] in question that would create a reasonable doubt about the independence of the [remaining] directors." In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 822 n.48 (Del. Ch. 2005).[8]

---

[7] Further, the likelihood of directors' liability is significantly lessened where, as here, the corporate charter exculpates the directors from personal liability for monetary damages for breaches of fiduciary duty absent bad faith, willful misconduct or a breach of the duty of loyalty. See JPMorgan Certificate of Incorporation at 5. Because of the exculpatory provision in JPMorgan's charter, Plaintiff must allege particularized facts showing that a majority of the directors "knowingly engaged in 'fraudulent' or 'illegal' conduct." Wood, 953 A.2d at 141. Plaintiff has failed to allege such facts.

[8] Plaintiff appears to have abandoned its additional allegations challenging the Directors' disinterestedness on the basis that: (1) the Director Defendants "would have been required to sue themselves and/or their fellow directors and allies", (Compl. ¶¶ 369, 373); (2) "the Director Defendants have not filed any lawsuits against themselves or others", (Compl. ¶ 376); (3) the Director Defendants' "D&O" Insurance" would not cover any suit brought by the Company against its own directors or officers, (Compl. ¶ 375); (4) the Directors Defendants are "well-compensated for their Board service," (Compl. ¶ 372); (5) some of the Director Defendants have served together on the boards of other companies or non-profit institutions; (Compl. ¶¶ 366-68); and (6) that several directors and their families received loans or credit from JPMorgan and that other directors are affiliated with or employed by institutions that have relationships with JPMorgan, (Compl. ¶¶ 360-65). These types of claims have been rejected by Delaware and New York courts as a basis to excuse a pre-suit demand. See, e.g. Seminaris v. Landa, 662 A.2d 1350, 1355 (Del. Ch. 1995); Richardson v. Graves, 1983 WL 21109, at *3 (Del. Ch. June 17, 1983); Decker v. Clausen, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989); Strugala v. Riggio, 817 F. Supp. 2d 378, 387 (S.D.N.Y. 2011); Halpert Enters., 362 F. Supp. 2d at 433; J.P. Morgan, 906 A.2d at 822 n.48.

**Conclusion**

Defendants' motion to dismiss is GRANTED. Plaintiff's complaint is dismissed in its entirety.

The Clerk of the Court is directed to close motion #35 on docket 12-cv-03878.

Dated: March 31, 2014
      New York, New York

SO ORDERED:

*George B Daniels*
GEORGE B. DANIELS
United States District Judge

13