UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |   |
|---|---|---|
| In re JPMORGAN CHASE & CO. DERIVATIVE LITIGATION | : : : : | Lead Case No. 1:12-cv-03878-GBD<br><br>MOTION FOR RECONSIDERATION |
| This Document Relates To:<br><br>    ALL ACTIONS. | : : : |   |

936617_1

**TABLE OF CONTENTS**

                                  **Page**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT .........................................................................................................................2

   A. Standard for a Motion for Reconsideration ...............................................................2

   B. The Court Did Not Consider All Reasonable Factual Inferences that Logically Flow from the Particularized Facts Alleged ............................................2

     1. The Order Did Not Consider Plaintiff's Allegations and Reasonable Inferences Regarding JPMorgan's Risk Management and Internal Control Framework ....................................................................3

     2. The Court Did Not Consider the Particularized Facts Regarding JPMorgan's Risk Limit Breaches and the Reasonable Inference that This Information Reached the Board of Directors ................................7

     3. The Order Did Not Consider the Settlements Between JPMorgan and Its Regulators ......................................................................................12

   C. Leave to Amend Is Appropriate...............................................................................13

III. CONCLUSION....................................................................................................................14

## TABLE OF AUTHORITIES

Page

**CASES**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 478 (S.D.N.Y. 2012)........................................................................2

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) .........................................................................................3

*Foman v. Davis*,
  371 U.S. 178 (1962).................................................................................................13

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013).....................................................................................14

*In re Abbott Labs. Derivative S'holder Litig.*,
  325 F.3d 795 (7th Cir. 2003) ............................................................................ passim

*In re JPMorgan Chase & Co. Derivative Litig.*,
  No. 12 Civ. 03878 (GBD), 2014 U.S. Dist. LEXIS 46363
  (S.D.N.Y. Mar. 31, 2014) ................................................................................ passim

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010)..........................................................5, 6, 8, 10

*In re SAIC, Inc.*,
  No. 12 Civ. 1353 (DAB), 2014 U.S. Dist. LEXIS 13629
  (S.D.N.Y. Jan. 30, 2014)...........................................................................................2

*In re Veeco Instruments, Inc. Sec. Litig.*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006).................................................................2, 3, 6

*Lichtenberg v. Besicorp Grp. Inc.*,
  28 F. App'x 73 (2d Cir. 2002) ...................................................................................2

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001) ............................................................................3, 5, 6

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................................10

*Shrader v. CSX Transp.*,
  70 F.3d 255 (2d Cir. 1995).........................................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................3, 11

936617_1

**Page**

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 15(a)(2) ...................................................................................................................13
    Rule 59(e) .........................................................................................................................1
    Rule 60(b) ........................................................................................................................1

Pursuant to Fed. R. Civ. P. 59(e) and 60(b), Plaintiff Wayne County Employees' Retirement System ("Plaintiff") respectfully submits this Motion (i) seeking to alter or amend the March 31, 2014 Judgment (entered on April 1, 2014), and (ii) for reconsideration of the Court's March 31, 2014 Memorandum Decision and Order (the "Order") dismissing Plaintiff's Second Amended Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Corporate Waste (the "Complaint") filed on behalf of JPMorgan Chase & Co. ("JPMorgan" or the "Company").  *See* Dkt. Nos. 53-54.

## I.   INTRODUCTION

The Order does not consider several important sets of facts.  First, the Complaint alleges a vast system of internal controls in place at JPMorgan to alert the Board of Directors ("Board") to severe risks to the Company.  The Court makes no mention of these facts.  *See infra* §B.1.  Second, the Complaint alleges facts showing that a majority of the JPMorgan Board, including not only Defendant Dimon but also the members of the Risk Policy Committee and the Audit Committee, knew the Chief Investment Office ("CIO") breached risk limits repeatedly in 2011 and 2012.  Notwithstanding these allegations, the Order incorrectly states that the Complaint "cites no factual allegations showing that any member of the Board other than Dimon was informed of those excessions."  *In re JPMorgan Chase & Co. Derivative Litig.*, No. 12 Civ. 03878 (GBD), 2014 U.S. Dist. LEXIS 46363, at *16-*17 (S.D.N.Y. Mar. 31, 2014).[1]  *See infra* §B.2.  Finally, both Plaintiff and Defendants informed the Court of landmark settlements – reached after the Complaint was filed – between JPMorgan and its regulators in the United States and the United Kingdom, causing JPMorgan to pay $1.2 billion in penalties and fines.  Notwithstanding Plaintiff's request for judicial

---

[1]   All citations and footnotes are omitted and emphasis is added, unless otherwise noted.

936617_1

notice of these settlements, the Order does not mention them.  *See infra* §B.3.  Nor did it provide leave to amend to include these settlements in the Complaint.  *See infra* §C.

Plaintiff is entitled to a reasonable inference, based on these facts alone, that a majority of the Board consciously disregarded a known risk, and therefore, faces a substantial likelihood of liability.[2]  Accordingly, Plaintiff respectfully requests that the Court reconsider its Order in light of these facts and hold that demand is futile.

## II.   ARGUMENT

### A.   Standard for a Motion for Reconsideration

Reconsideration will be granted if the "moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 478, 483 (S.D.N.Y. 2012).  Further, reconsideration is appropriate where "'factual matters that were put before the Court on the underlying motion'" were misconstrued.  *In re SAIC, Inc.*, No. 12 Civ. 1353 (DAB), 2014 U.S. Dist. LEXIS 13629, at *17 (S.D.N.Y. Jan. 30, 2014) (quoting *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002)).

### B.   The Court Did Not Consider All Reasonable Factual Inferences that Logically Flow from the Particularized Facts Alleged

When deciding whether demand futility is adequately pled, a court must consider all of the particularized facts alleged.  *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) ("Whether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the board must be determined

---

[2]   In the interest of brevity, Plaintiff incorporates the facts stated in its Opposition to Defendants' Motion to Dismiss or, in the Alternative, Stay this Action ("Opp.").  Dkt. No. 39 at 1-5.

from the accumulation of all facts taken together.") (citing *McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001)); *see generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (court must "consider the complaint in its entirety" and, in doing so, "accept all factual allegations in the complaint as true"). Further, it is axiomatic that "with all motions to dismiss, plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged." *Veeco*, 434 F. Supp. 2d at 274 (citing *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)). In deciding the motion to dismiss here, the Order did not consider all of the particularized facts taken together, nor did it draw reasonable inferences from those facts in Plaintiff's favor. Had it done so, the Court would have concluded that demand is futile for a majority of JPMorgan's Board, and would have denied Defendants' Motion to Dismiss.

### 1. The Order Did Not Consider Plaintiff's Allegations and Reasonable Inferences Regarding JPMorgan's Risk Management and Internal Control Framework

Plaintiff respectfully submits that the Order did not consider the particularized factual allegations in the Complaint detailing JPMorgan's risk management and internal control framework designed to keep Defendants informed regarding the Company's risk. By failing to consider these allegations, the Order necessarily failed to make reasonable inferences in Plaintiff's favor that logically flow from the Company's risk management and internal control framework.

The Order overlooks the Complaint's extensive allegations that Defendants repeatedly caused JPMorgan to tell shareholders that its risk management framework and internal controls were exceptional and designed to "provide comprehensive controls and ongoing management of the major risks inherent in its business activities." ¶¶54, 56, 59, 60, 62, 79.[3] The Company's internal controls and risk management framework assigned specific duties to the Board and each of its Committees

---

[3] All "¶__" or "¶¶__" references are to Plaintiff's Complaint.

- 3 -

related to risk management. For example, the entire Board was required to: (1) "[a]ssess and manage the Firm's credit risk, market risk, structural interest rate risk, investment risk, liquidity risk, fiduciary risk and model risk"; (2) "[e]nsure that there is in place an effective system reasonably designed to evaluate and control such risk throughout the Firm"; and (3) "[m]anage capital and liquidity planning and analysis." ¶¶65, 78.

Additional risk-related responsibilities were assigned to the Board's Risk Policy and Audit Committees.[4]  ¶¶57, 59. The Risk Policy and Audit Committees created and monitored the Company's "formalized risk appetite framework" and designed it to "clearly link risk appetite and return targets, controls and capital management." ¶59. The Risk Policy Committee members were specifically "responsible for oversight of the CEO's and senior management's responsibilities to assess and manage the corporation's credit risk, market risk, interest rate risk, investment risk, liquidity risk and reputational risk," and were required to "***review benchmarks for and major financial risk exposures from such risks***." ¶¶65, 343. The Audit Committee members were similarly required to "discuss . . . guidelines and policies for assessing and managing the corporation's exposure to risks, including reputation risk, ***the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures***." ¶¶64, 334.

While these factual allegations are not mentioned in the Order, they establish with particularity that JPMorgan had a risk management and internal control framework in place to provide information to (at least) the six directors sitting on the Risk Policy and Audit Committees.

---

[4]  Six of JPMorgan's 11 directors sit on the Risk Policy (Cote, Crown, and Futter) and Audit (Bowles, Jackson, and Gray) Committees.

*See* Opp. at 10.  From these facts, it is reasonably inferred that the internal controls worked (as Defendants stated) and delivered information to the Board.

Appellate courts have found reversible error where a lower court granted a motion to dismiss for demand futility by failing to make such inferences in the face of similar facts.  In *Abbott Labs.*, the Seventh Circuit reversed the lower court while noting that "[w]here there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required."  *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 806 (7th Cir. 2003); *see also In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461 (S.D.N.Y. 2010).  Just as here, "[s]everal of the directors were members of the Audit Committee, which was charged with assessing any risks involved in regulatory compliance."  *Abbott Labs.*, 325 F.3d at 808.  Additionally, "the directors had a fiduciary duty under the SEC to comply with 'comprehensive government regulations' and signed SEC forms attesting to knowledge and responsibility for government regulation compliance."  *Id.*  In light of these obligations, the Seventh Circuit inferred "direct knowledge" on the part of the Audit Committee members because "[u]nder proper corporate governance procedures – the existence of which is not contested by either party in *Abbott* – information of the violations would have been shared at the board meetings."  *Id*. at 806.

Similarly, in *McCall*, the Sixth Circuit inferred knowledge of the entire Board based on allegations that the Audit Committee received reports "that improper practices were being employed throughout the corporation" and "reported to the rest of the Board."  239 F.3d at 820.  The Sixth Circuit thus reversed the lower court's decision because it "erred by viewing the factual allegations separately and by refusing to draw reasonable inferences in plaintiffs' favor."  *Id*. at 817.

- 5 -

936617_1

Courts in the Second Circuit have followed suit. In *Pfizer*, the court held that "nothing in either federal or Delaware law holds it insufficient for individual directors' knowledge and liability to be pleaded inferentially." *Pfizer*, 722 F. Supp. 2d at 461-62 (citing *Abbott Labs.*, 325 F.3d at 809; *McCall*, 239 F.3d at 824). Accordingly, the *Pfizer* court held that demand was futile because, just as here, "in the face of the board's own express formal undertakings to directly monitor and prevent [the alleged] misconduct . . . the inference of deliberate disregard by each and every member of the board is entirely reasonable." 722 F. Supp. 2d at 462. Similarly, in *Veeco*, the court made several reasonable inferences about director knowledge from facts describing the company's internal controls. 434 F. Supp. 2d at 274.

Plaintiff respectfully submits that, had the Order addressed JPMorgan's risk management and internal control framework, and Defendants' obligations thereunder, it would have concluded that a majority of directors – specifically Dimon, the Risk Policy Committee members (Cote, Crown, and Futter), and the Audit Committee members (Bowles, Jackson, and Gray) – were aware of the significant problems facing JPMorgan when risk limits were repeatedly exceeded and, despite this knowledge, did nothing to rein in the outsized risks being taken by the CIO. ¶323. Just as in *Abbott Labs.*, *McCall*, *Pfizer* and *Veeco*, this is especially true where, as here, Plaintiff also alleged that each of those seven Board members received numerous red flags alerting them repeatedly to the CIO's excessive risk taking and the massive damage it could (and ultimately did) cause JPMorgan. *See infra* §B.2.[5] Because of their conscious inaction, a majority of the Board (seven of 11 directors) faces a substantial likelihood of liability and cannot adequately consider a demand.

---

[5] Despite the analogous nature of the claims and allegations here and in *Abbott Labs.*, *McCall*, *Pfizer* and *Veeco*, the Order merely references *Abbott Labs.* but fails to address the Seventh Circuit's inference of the board's knowledge from the existence of corporate governance procedures. *See* Order at 9 n.6.

### 2. The Court Did Not Consider the Particularized Facts Regarding JPMorgan's Risk Limit Breaches and the Reasonable Inference that This Information Reached the Board of Directors

The Complaint asserts particularized allegations concerning the ballooning risk at the CIO that led to repeated and significant risk limit breaches sufficient to demonstrate the dangerous risk associated with the CIO and the massive damage facing JPMorgan. Plaintiff's allegations explain that the risk limits established by the JPMorgan Board, as required by its federal regulators, were established to provide red flags alerting the Board and senior management to excessive risk taking. In fact, JPMorgan later admitted to the Senate Subcommittee that its risk limits were intended to act as "red flags." ¶92. By design, these red flags alerted the Board and senior management to excessive risk taking that was jeopardizing JPMorgan's business with huge potential losses. ¶323. The reasonable inference from these repeated risk limit breaches is that the Board knew of the excessive risk taking at the CIO. With this knowledge, the Board consciously disregarded its duty to act to prevent the damage stemming from this risk.

With these risk limits in place, the excessive risk of the CIO's Synthetic Credit Portfolio ("SCP") could not, and did not, go undetected. The amount of risk JPMorgan amassed exceeded predetermined risk limits **hundreds** of times from 2011 to 2012. ¶¶149-154, 177, 181-184, 191, 194, 206(d), 209(d). These breaches were not minimal or infrequent; they were not one-off events. Rather, they were consistent and repeated, and therefore were another damning fact that must be construed in Plaintiff's favor. ¶¶206(d), 209(d).

From the particularized allegations regarding JPMorgan's risk management framework and internal controls alone, it can be reasonably inferred that each of these myriad risk limit breaches were communicated to at least the members of the Risk Policy Committee and the Audit Committee, if not the entire Board. *See supra* §B.1. Like *Abbott Labs.*, where the "paper trail" supported the

- 7 -

inference that the board knew of the misconduct and did nothing, the same inference follows here. 325 F.3d at 809. Similarly, in *Pfizer*, Judge Jed S. Rakoff *inferred* that information that should have reached the board regarding misconduct *did* reach the board. 722 F. Supp. 2d at 461-62. Here, despite earlier similar allegations, the Court did not draw the same reasonable inferences.

Beginning in 2011, Dimon and members of the Risk Policy and Audit Committees received regular detailed reports showing the SCP's violation of risk limits. ¶¶206(c)(ii), 206(d)(ii); *see also* Opp. at 10, 16. Contrary to the Order, the Complaint alleges much more than "a few occasions in early 2011" where the CIO violated its risk metrics. *JPMorgan*, 2014 U.S. Dist. LEXIS 46363, at *16. The Complaint alleges that the SCP caused the CIO to breach its aggregate stress limits *eight times, for weeks at a time*, through the first half of 2011. ¶206(d) n.3. At times, these breaches *lasted up to seven consecutive weeks*, and *were 50% over the limit*. *Id*. These risk limit breaches were communicated to Dimon and the members of the Risk Policy and Audit Committees through regular detailed reports. ¶¶206(d), 337, 344; *see also* Opp. at 16.

Despite alleging these particularized facts regarding the Board's awareness, the Order holds that "the Complaint alleges only that the Board Risk Policy Committee (three independent directors) learned that CIO had breached stress limits on a few occasions in early 2011." *JPMorgan*, 2014 U.S. Dist. LEXIS 46363, at *16. The Order based this holding on the Complaint's allegations that the Risk Policy Committee received data showing "Firmwide and business-specific risk metrics," including "the results of various stress tests on a Firmwide basis and for specific lines of business and CIO." ¶206(d)(ii) (cited at 2014 U.S. Dist. LEXIS 46363, at *16).

That holding is mistaken. The Complaint alleges much more. In fact, the paragraph cited in the Order supporting the Risk Policy Committee members' knowledge of the 2011 risk limit breaches alleges that the Audit Committee *also* "received regular reports from each line of business

- 8 -

936617_1

and CIO regarding risk-limit metric performance as part of each unit's quarterly and annual financial reporting." ¶¶206(d)(ii), 337, 344. Thus, the Court's inference that these reports informed the Risk Policy Committee members of the risk limit breaches applies equally to the particularized facts in the same paragraph that the Audit Committee members received the same or similar reports. These reports make the members of the Risk Policy Committee *and* the Audit Committee aware that the CIO carried significant and dangerous risk and was repeatedly breaching risk limits. *See* Opp. at 16.

Additional allegations bolster a finding of demand futility. The significant risk carried and grown in the SCP came to a head in early 2012 when the portfolio not only caused the CIO to continue to breach its risk limits ***more than 330 times***, but caused JPMorgan to breach its ***firmwide*** risk limits as well. ¶¶149, 152-154; *see also* Opp. at 17. The Order recognizes that the Complaint alleged that "JPMorgan exceeded its firm-wide VaR limit in January [2012]" and "also points to CIO's limit excessions in early 2012." *JPMorgan*, 2014 U.S. Dist. LEXIS 46363, at *16-*17. Despite this, the Order lessens these risk limit breaches by asserting that "the Complaint alleges that this information was reported only to one director: JPMorgan's CEO Dimon" (citing ¶152) and that there are "no factual allegations showing that any member of the Board other than Dimon was informed of those excessions." *Id*.

Those assertions are incorrect. The Complaint does not allege that the awareness of these risk limit breaches was limited to a single Board member – Dimon. In fact, the Complaint clearly alleges that ***at least*** another six directors – those serving on the Risk Policy Committee and the Audit Committee – received information related to these breaches. Both committees received regular reports detailing the risk limit performance of each line of JPMorgan's business, including VaR measurements – the firmwide risk limit the CIO breached for ***four consecutive days*** in January 2012. ¶¶209(d)(ii), 306, 344. The reasonable inference that follows is that the Risk Policy Committee and

the Audit Committee knew of these risk limit breaches. *See* Opp. at 16-17. Indeed, the Order concluded that the Risk Policy Committee knew of the 2011 risk limit breaches from the reports its members received in 2011. *JPMorgan*, 2014 U.S. Dist. LEXIS 46363, at *16. Thus, by the same reasonable inference, the Risk Policy and Audit Committee members knew of the 2012 risk limit breaches.

Additionally, the Complaint alleges that the Risk Policy Committee had a meeting on January 17, 2012 in the middle of the four-day firmwide VaR breach caused by the CIO. ¶344. The reasonable inference being that the directors specifically tasked with monitoring risk at JPMorgan discussed a massive firmwide risk limit breach caused by a single business unit at their meeting taking place at the time of that breach. Moreover, it can be reasonably inferred from the sheer magnitude and consistency of these risk limit breaches that the members of these committees, if not the entire Board, knew. *See Pfizer*, 722 F. Supp. 2d at 462 ("To put it bluntly, the allegations of the Complaint evidence misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board is entirely reasonable."); *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 942-43, n.21 (9th Cir. 2003) (finding it "absurd to suggest that the Board of Directors would not discuss either the repurchasing authorization for millions of dollars worth of stock or the FAA investigations or negotiations [regarding significant maintenance issues].").

Even if Dimon were the sole initial recipient of this information, it is reasonably inferred that he shared such important information with the remainder of the Board. *See* Opp. at 15. In *Abbott Labs.*, the FDA sent letters identifying misconduct to a single board member who, like Dimon, was the CEO and Chairman of the Board at the company. 325 F.3d at 806. From this, the Seventh

Circuit reasonably inferred that the board of directors was aware of misconduct at the company because the board member would have shared such important information with the entire board. *Id*. The same reasonable inference should be drawn here as it is as plausible (if not more plausible) that Dimon shared this critical information regarding the 330 risk limit breaches with the Board than the competing inference that he did not. *Tellabs*, 551 U.S. at 324 (scienter allegations are sufficient when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one would draw from the facts alleged"). As JPMorgan's CEO and the Chairman of its Board, Dimon was duty-bound to share significant and excessive risks to the Company with the entire Board.[6] Thus, when the CIO's risk reached a level at which it threatened the entirety of JPMorgan, Dimon would have, and did, share that information with the other directors. Such an inference is reasonable, plausible, and required.

A majority of the Board also saw the dramatic increase in the SCP's notional value, which is the measure of how much money was at risk from the portfolio's trades. In 2011, the SCP's notional value grew by more than 1,000% to $51 billion (from $4 billion in 2008). ¶206(c); *see also* Opp. at 14. The notional value continued to grow at an alarming rate in the beginning of 2012, when it *tripled* in the first quarter from $51 billion to $157 billion. ¶209(c)(ii). The Risk Policy Committee members were alerted when they received detailed reports before each of their meetings titled "Risk Management: General Market Discussion" that included an appendix of data showing economic and allocated capital for each of the Firm's six lines of business and for the Corporate Sector, which included the CIO. ¶206(c)(ii). Further, on March 20, 2012, the Risk Policy Committee received its

---

[6] Importantly, Defendant Dimon did not have to determine if the CIO's risk exposure was significant or excessive because JPMorgan and its regulators already determined breaches of these risk limits represented risk that was objectively too great and required action to prevent damage to JPMorgan's enterprise and the financial markets.

- 11 -

936617_1

annual presentation about the CIO that included information detailing the numerous risk limit breaches caused by the CIO.  ¶¶198, 209(a)(ii).

Likewise, the Audit Committee members received regular financial reports from each business unit and the CIO before quarterly and annual financial disclosures that showed the CIO's growing notional value and its sustained breaches of JPMorgan's risk limits.  ¶206(c)(ii).  Then, on March 30, 2012, the directors of the Risk Policy, Audit, and Corporate Governance & Nominating Committees received a presentation from JPMorgan's internal audit group describing how the CIO failed to comply with firm-wide risk management standards.  ¶209(e)(ii).  These alleged facts lead inexorably to one overriding conclusion: The outsized and excessive risk being taken by the CIO was evident to the Risk Policy Committee and Audit Committee members by the dramatic increase in notional value that represented a significant risk to JPMorgan.  Yet, the Order does not mention these allegations.

In the face of their known duty to act, the defendant directors did not act, and JPMorgan suffered as a result.  Had the Order considered these facts in their entirety and the reasonable inferences to be drawn from them, the Court would have concluded that demand is futile and denied Defendants' Motion to Dismiss.  Reconsideration and relief from Judgment is therefore warranted.

### 3. The Order Did Not Consider the Settlements Between JPMorgan and Its Regulators

The failure of JPMorgan's Board to act in the face of the dangers posed by the CIO's excessive risk is further bolstered by the fact that JPMorgan paid over $1 billion in fines related to the Company's failure to monitor and control that risk.[7]  As the OCC determined when fining

---

[7]  The settlements leading to these fines were submitted to the Court prior to its decision on Defendants' Motion to Dismiss.  On September 25, 2013, Plaintiff submitted a request for judicial notice of the settlements reached between JPMorgan and the OCC, the Federal Reserve System, the SEC, and the Financial Conduct Authority.  Dkt. No. 46.  Defendants did not oppose Plaintiff's

- 12 -

936617_1

JPMorgan $200 million, "[t]he CIO was able to increase its positions and risk, and ultimately losses, without sufficiently effective intervention by the Bank's control groups," *i.e.*, its Board. *See* Dkt. No. 46. Similarly, the U.K. Financial Conduct Authority found when penalizing JPMorgan approximately $231 million, "[t]he losses were caused by a high risk trading strategy, weak management of that trading and an inadequate response to important information ***which should have notified*** the Firm ***of the huge risks present*** in the SCP." *See* Dkt. No. 46. Additionally, with its $100 million fine, the CFTC stated, "JPMorgan's management of the SCP's risk during the first quarter of 2012 was wholly inconsistent with principles of sound risk management." *See* Dkt. No. 47. These settlements and their findings support a reasonable inference of the Board's awareness and culpability, and thus, demand futility. The Order does not mention these settlements nor does it draw any reasonable inferences from them.[8]

### C. Leave to Amend Is Appropriate

Even should the Court conclude that the particularized facts and reasonable inferences of the Complaint do not support a finding of demand futility, additional facts that did not exist at the time the Complaint was filed provide reason for the Court to grant Plaintiff leave to amend. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371

---

request. On October 17, 2013, Defendant submitted by letter the settlement reached between JPMorgan and the CFTC. Dkt. No. 47. The Court did not rule on Plaintiff's request nor did it mention any of these settlements in its Order.

[8] These settlements also contradict the Order's finding that the risks posed to JPMorgan by the SCP were only "business risks." *JPMorgan*, 2014 U.S. Dist. LEXIS 46363, at *14-*15 ("Because Plaintiff's claim is premised on an alleged failure to monitor ***business risks*** their [sic] burden is even greater.") (emphasis in original). This business risk categorization and the resulting higher standard ignore the Complaint's factual allegations and the resulting settlements from JPMorgan's misconduct. The excessive risk-taking of the CIO violated JPMorgan's internal risk limits (that it admitted were "red flags") and governmental regulations. The violations of acceptable risk management were so great that JPMorgan paid $1.2 billion in fines. Companies do not pay fines of this magnitude simply because of "business risks."

U.S. 178, 182 (1962) (leave to amend should be "freely given"); *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 140 (2d Cir. 2013). Although the Order did not address Plaintiff's request for leave to amend that was made in its Opposition (Opp. at 40), amendment is further warranted by additional facts relating to Defendants' culpability that have emerged after the Complaint's filing. For example, the documents evidencing JPMorgan's settlements with its regulatory agencies contain numerous facts and admissions by JPMorgan related to the circumstances at issue here. While these documents were submitted to the Court by the parties, the facts, admissions, and reasonable inferences to be drawn therefrom do not appear in the Complaint. These additional facts warrant leave to amend.

### III. CONCLUSION

For the foregoing reasons, the Court should grant reconsideration, deny Defendants' Motion to Dismiss, and alter/amend its Judgment to reflect that denial.

DATED: April 28, 2014					Respectfully submitted,

							ROBBINS GELLER RUDMAN
							  & DOWD LLP
							BENNY C. GOODMAN III
							ERIK W. LUEDEKE
							FRANCIS A. DIGIACCO


							        s/ Benny C. Goodman III
							     BENNY C. GOODMAN III

							655 West Broadway, Suite 1900
							San Diego, CA  92101
							Telephone:  619/231-1058
							619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
DAVID ELLIOT
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 28, 2014.

                                                s/ Benny C. Goodman III
                                                BENNY C. GOODMAN III

                                                ROBBINS GELLER RUDMAN
                                                      &DOWD LLP
                                                655 West Broadway, Suite 1900
                                                San Diego, CA  92101-8498
                                                Telephone:  619/231-1058
                                                619/231-7423 (fax)

                                                E-mail: bennyg@rgrdlaw.com